**Abe LEVIN, Plaintiff,**

v.

**Joseph MARDER et al., Defendants,**

v.

**Erik F. LÁWSON, Jr., et al., Third-Party Defendants.**

**Civ. A. No. 69–1340.**

United States District Court, W. D. Pennsylvania.

April 11, 1972.

---

---

John A. Metz, Jr., Metz, Cook, Hanna & Kelly, Pittsburgh, Pa., for plaintiff.

Robert A. Jarvis, Beck, McGinnis & Jarvis, Stanley V. Ostrow, Kaplan, Finkel, Lefkowitz, Roth & Ostrow, Erik F. Lawson, Jr., Pittsburgh, Pa., for defendants.

## OPINION

TEITELBAUM, District Judge.

This is a multiple party, multiple count action involving claims, third-party claims, counterclaims and cross-claims. The plaintiff is Abe Levin, a former stockholder in the corporate defendants, Lotta Cola Company, Regent Bottling Company and Levmar Corporation. The individual defendants, Joseph Marder and Thelma Marder (brother and sister), are also former stockholders in the corporate defendants Lotta Cola and Regent Bottling. This fracas springs from the fact that Levin is a more former stockholder than the Marders.

The complaint alleges, in five counts, fraud and deceit by the Marders in the "redemption" by each of the corporate defendants of Levin's respective stock-holdings therein. Three of the counts allege violations of Section 10(b) of the Securities Exchange Act of 1934 (15 U. S.C. § 78j(b)) and Rule 10b–5 (17 CFR 240.10b–5) promulgated thereunder.[1] One alleges a breach of the duty owed by majority to minority stockholders, and one alleges common law fraud and deceit.

By third-party complaints, all of the original defendants have joined Erik F. Lawson, Jr. and Robert C. Levin (Abe Levin's son) as third-party defendants, and the Marders have joined Apollo Industries, Inc. and Apollo-Regent Corporation as third-party defendants. Finally, various of the original and third-party defendants have both counterclaimed and cross-claimed against various of the other original and third-party defendants.

Presently pending are (1) the motions for summary judgment made by all of the original defendants against Levin and (2) the motions for summary judgment made by the third-party defendants, Apollo and Apollo-Regent against the Marders. All of the motions are, of course, pursuant to F.R.Civ.P. 56.

The factual setting of this action while complex, is in many particulars undisputed. In the late 1950's and early 1960's the plaintiff and the individual original defendants promoted the incorporation of Lotta Cola, Regent Bottling and Levmar. The incorporations were of businesses which those individuals, and apparently only those individuals, had for many years conducted as partnerships. Following the incorporations, the outstanding stock of each of the three corporations was owned one-third each by Levin and the two Marders. In other words, each of the three individu-

---

1. "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

 (a) To employ any device, scheme, or artifice to defraud,

 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security."

als owned one-third of the outstanding stock of each of the three corporations.

Through the many years in which the businesses, which were of concocting and bottling soft drinks, were conducted as partnerships, they were closely managed and operated jointly by all of the three partners. After the incorporations the three, as stockholders, continued to be as intimately and as actively involved in the management and operation of the corporations as they had of the partnerships. Basically, both before and after the incorporations, the businesses were closely controlled three-person operations.

In the late 1960's, for reasons which are both critical and contested, Levin and the Marders engaged in negotiations which contemplated the ultimate sale by Levin of all of his stockholdings in each of the corporations. Who initiated the negotiations, and why, is what is contested. Levin contends that it was the Marders who originated the negotiations, based on their knowledge of his wish to retire and their wish ostensibly to involve their respective sons-in-law in the businesses. The Marders contend that Levin, wanting with some immediacy because of his waning health to retire to Florida, approached them. In any event, the negotiations into which they all willingly entered, each represented by counsel, culminated in the "redemption"[2] which is by this action alleged to have been fraudulently and deceitfully induced.

The parties first had a meeting of the minds, at least in principal, in the spring of 1968. At that time it was agreed that the April 30, 1968 book values of the corporations would serve as the basis for the redemption price of Levin's stock. The rush of the 1968 summer season of the businesses intervened however, and the agreement was not reduced to writing until September 1968. That writing, after some revision, was proposed at a meeting of the parties' attorneys on October 3, 1968. At that time[3] it included the following clause:

"WHEREAS, Levin acknowledges that he is aware that, for a period of many months, efforts have been made to interest others into buying all, or a substantial part of, this Corporation; that the sale of the Corporation is being offered by several brokers; and that inquiries by prospective purchasers have been made thereon from time to time and that an oral offer of $1,250,000.00 for all of the shares of Regent Bottling Co., Levmar Corp. and Lotta Cola Co. was received on or about September 19, 1968 and was refused. Levin agrees that should the Corporation be sold hereafter, the entire net proceeds, of any such sale shall accrue to the benefit of the then shareholders thereof, and that the April 30, 1968 book value of the Corporation is being used as the basis for determining the selling price of Levin's interest and that such book value is a fair price for his interest at this time."

Whether or not Levin was, in fact, aware that efforts were being made to sell all or a substantial part of the businesses is in diametric dispute. Levin contends that he was not the least bit aware of such efforts; the Marders contend he was aware of such efforts.

He contends that in response to his attorney's[4] inquiries about the clause, as it appeared both in the first and final drafts, the Marders advised him (1) that while no negotiations were then

---

2. At the outset the parties envisioned the direct purchase by the Marders of Levin's stock. However, the parties subsequently resolved, for tax purposes, that his stock would be "redeemed" by the corporations.

3. The inclusion of the reference to the oral offer of $1,250,000.00 was made after the preparation of the first draft of the agreement which was proposed to Levin on September 13, 1968. In all other respects this particular clause was identical in the final draft to that in the first draft.

4. Both sides proceeded throughout the negotiations through their respective attorneys.

pending, on infrequent occasions unsolicited inquiries were made of the Marders as to the availability for purchase of the three corporations, (2) that Joseph Marder was at one time interested in a law career and had instructed the inclusion of the clause as a protective measure and (3) that it was unlikely, in the opinion of the Marders' attorney, that the businesses would ever be sold to an outsider. On the other hand, the Marders contend that they[5] had solicited purchasers on behalf of all three of the stockholders for many years and that the clause simply represented the facts as they were, and as Levin knew them to be, with the exception of the specific reference in the final draft to the oral offer of $1,250,000.00.

The real importance of the dispute over the awareness of Levin of the endeavors of the Marders to interest outsiders in the purchase of the businesses emerges in the light of certain events of August of 1968. During that month three potential purchasers approached the Marders' attorney. One of the approaches was in terms of a "preliminary proposal" to purchase two of the three corporations for $900,000.00 and to lease from the third its property. That proposal was put forth by one David Lowenthal representing, at that time, an undisclosed principal. In response to the proposal the Marders promptly furnished Lowenthal with certain information which he requested regarding the business and finances of the corporations. Lowenthal, however, did not recontact the Marders after he received the information and by the time the agreement was prepared in September in final form, as far as they allegedly knew, his principal had lost interest.

Another of the approaches was by a group of New York investors headed by one Joseph Blau. By the time of the preparation of the first draft of the agreement, the Blau group had not made an offer. In fact, there were at that time no indications that an offer would

ever be made. Between the first and the final drafts of the agreement, however, the interest of the Blau group blossomed, and on September 19, 1968, they made an offer to purchase the corporations for $1,250,000.00. Mr. Marder rejected the offer, primarily because it was conditioned on the Marders continuing in the management of the corporations for an extended period of time. (They, too, were evidently anxious to leave the businesses.) While Levin was not informed immediately of the offer and its rejection, his attorney was advised at the meeting of October 3 not only of the offer and its rejection but also of the fact that the clause in the first draft of the agreement regarding the efforts of the Marders to sell the corporations had been amended to include a specific reference to the offer. Levin's attorney maintains that at that time he was assured that that offer was unrevivable and that no other negotiations were then pending. (The third approach was never a serious one, and is not here important.)

After the meeting, Levin's attorney allegedly reviewed with him and his son, Robert, the final draft of the agreement, and related to him the making and the rejection of the Blau offer. Thereafter, thinking the principal purpose of the "redemption" to be to perpetuate family ownership of the businesses and allegedly actually ignorant of the efforts of the Marders to resell the businesses to an outsider, Levin executed the agreement. It subsequently took effect on October 23, 1968. On that date Levin's stockholdings in each of the three corporations were "redeemed" at the approximate aggregate book value, or $275,000.-00. By corporation, he received $17,201.28, $151,022.98 and $106,775.74, respectively for Lotta Cola, Regent Bottling and Levmar. It is not disputed that at no time prior to the execution of the agreement did the Marders disclose to Levin the "preliminary proposal"

---

5. Again acting through their attorney.

made by Lowenthal. That nondisclosure is the crux of this action.

On October 30, 1968, one surfacely suspicious week after the consummation of the "redemption", Lowenthal reappeared and disclosed his principal to be Apollo Industries. Apollo's interest in the corporations apparently rejuvenated, negotiations ensued which resulted on January 3, 1969, in the acquisition by Apollo of all of the outstanding stock of Lotta Cola and Regent Bottling for $900,000.00, and of a lease from Levmar for the property of the corporations, which was held by Levmar.[6]

In the meantime, Levin had retired to Florida. He first learned of both the negotiations with, and sale and lease to, Apollo of the businesses when his attorney, who had read of the transactions in the newspaper after they had been consummated, told his son, who was with him in Florida, in a long-distance telephone conversation on January 7, 1969. Immediately following the conversation, his son also advised him that his attorney had indicated the potentiality of a lawsuit against "Regent",' to which Levin simply replied "Good". On January 12, 1969, Levin suffered a severe stroke, and from then until now has been completely incapacitated and unable to speak. This action was instituted on November 24, 1969.

The aggregate of the grounds asserted in support of the motions for summary judgment of the original defendants are: (1) the plaintiff has not authorized this action, (2) no instrumentalities of interstate commerce are involved, (3) no "sale" of a security is involved. (4) the plaintiff is barred from proceeding by virtue of the express release in the redemption agreement, (5) the plaintiff is barred from proceeding by virtue of laches, (6) the plaintiff is barred from proceeding by virtue of his failure to disaffirm the agreement and (7) on the basis of the uncontested facts, they are entitled to summary judgments as a matter of law. The moving third-party defendants, Apollo and Apollo-Regent, assert as grounds for their motion against the Marders, essentially (1) that they did not assume, as is alleged, the payment of any and all claims against Lotta Cola and Regent Bottling and (2) that the allegations are barred by the statute of frauds.

F.R.Civ.P. 56(c) provides that summary judgment shall be entered,

" . . . if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Further, the rule requires, as amended in 1963, that if the moving party establishes by depositions, answers to interrogatories and affidavits that there is no genuine issue of material fact and that on the established and uncontroverted facts the moving party is entitled, as a matter of law, to a judgment, the opposing party cannot stand on the pleadings but is obligated to produce documents to expose the genuine issue of material fact. See Jacobson v. Maryland Casualty Co., 336 F.2d 72 (8th Cir. 1964), cert. den'd., 379 U.S. 964, 85 S.Ct. 655, 13 L.Ed.2d 558 (1965); Missouri Pacific Railroad Co. v. National Milling Co., 409 F.2d 882 (3rd Cir. 1969); Robin Construction Company v. United States, 345 F.2d 610 (3rd Cir. 1965); and 6 Moore's Fed.Prac. ¶56.22 [2].

To prevail on a motion for summary judgment, of course, the moving party must clearly demonstrate the absence of a genuine issue of material fact. All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. First Pennsylvania Banking and Trust Co. v. United States Life Insurance Co., 421 F.2d 959 (3rd Cir. 1969); Associated Hardware Supply Co. v. Big Wheel Distributing Co., 355 F.2d 114 (3rd Cir.

---

6. Actually, Apollo-Regent, a wholly-owned subsidiary of Apollo which was created on December 30, 1968, acquired the stock.

1966). And neither should factual inferences be drawn nor credibility issues resolved in favor of the moving party. First Pennsylvania Banking and Trust Co. v. United States Life Insurance Co., supra; see, generally, 6 Moore's Federal Practice ¶56.15.

■■ Of the original defendants' arguments some are plainly specious, while others are only ineffectual. Included among those which are only ineffectual is that relating to jurisdictional means. The statutory jurisdictional standard is whether or not the sale and purchase were,

> " . . . by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange . . . . "

The defendants argue that since the totality of the transactions were conducted locally in Pittsburgh, Pennsylvania, interstate commerce is not involved. The relevant cases interpreting this aspect of Rule 10b–5 were recently reviewed in Ingraffia v. Belle Meade Hospital, Inc., 319 F.Supp. 537 (D.C.E.D.La.1970). There on the basis that "of interstate commerce" modifies "instrumentality",[7] it was concluded that four intrastate telephone calls as a part of the sales transaction were sufficient. In the instant action, while all of the negotiations were indeed between parties in Pittsburgh, the communications were both by telephone and through the mails. In fact, at least the first draft of the agreement was transmitted through the mails. And as was correctly pointed out in *Ingraffia*, citing Fratt v. Robinson, 203 F.2d 627 (9th Cir. 1953), Blackwell v. Bentsen, 203 F.2d 690 (5th Cir. 1953), and United States v. Robertson, 181 F.Supp. 158 (D.C.S.D.N.Y.1959), the fraud itself need not be transmitted through the jurisdictional means—it is enough if the jurisdictional means play a material role in the transaction. See, generally, 2 Bromberg Securities Law § 11.2, and Superintendent of Insurance of the State of New York v. Bankers Life and Casualty Company, 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971). That the fraud itself need not be transmitted is manifest in an instance in which fraud is alleged in the form of an *omission*.

■ With respect to whether the transaction was a sale as required by Rule 10b–5, the defendants' argument is equally unpersuasive. They argue that it was not a sale, but was actually a redemption. A true redemption, however, is decidedly different in that it is compulsory, i. e., it is a right which an issuer of a security has to redeem that security. In this action, Levin was under no obligation to sell his stockholdings to the corporations, and thus, the transaction was clearly a "sale" within the meaning of Rule 10b–5. Cf., generally, Superintendent of Insurance of the State of New York v. Bankers Life and Casualty Company, 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971). Moreover, even assuming that the transaction was a kind of a redemption, it has been held that at least that kind of a redemption is within the coverage of the Rule. Speed v. Transamerica Corp., 99 F.Supp. 808 (D. C.D.Del.1951), aff'd., Speed v. Transamerica Corp., 235 F.2d 369 (3rd Cir. 1956).

■■ With respect to the asserted bar to the plaintiff's proceeding by virtue of the release in the agreement, it is fundamental that, notwithstanding the parol evidence rule, parol evidence is always permissible to show fraud or misrepresentation. Berger v. Pittsburgh Auto Equipment Co., 387 Pa. 61, 127 A. 2d 334 (1956); see 3 Corbin, Contracts § 580 and 4 Williston on Contracts § 631.

■ Two of the defendants' arguments, however, are alluring. Of those, first, they argue that Levin has not authorized this action, and, in fact, that he has no knowledge of it. They argue that the only power of attorney which

---

7. See, *contra*, Rosen v. Albern Color Research, Inc., 218 F.Supp. 473 (D.C.E.D.Pa.1963).

he gave his son, Robert, that of August 17, 1968, was clearly limited to conducting financial transactions. Further they maintain that before his stroke Levin neither suggested nor assented to the filing of any action, particularly against the Marders.[8] On behalf of the plaintiff, on the other hand, it is submitted that the authority for this action is founded not on the power of attorney which he gave to his son but simply on the authority of Levin, i. e., the response of "Good" to the indication of the potentiality of a lawsuit.

In Meredith v. The Ionian Trader, 279 F.2d 471 (2nd Cir. 1960), it was stated that,

> "[A] suit initiated without authority from the party named as plaintiff is a nullity and any judgment obtained in such a suit is void."

Neither the wisdom nor the authority of this proposition can be doubted. The difficulty in the instant action is in determining whether or not Levin's unamplified response of "Good" to the indication of the potentiality of a suit against "Regent" constituted authorization for this action. I think it did. At the time of his response no investigation had been undertaken, and a lawsuit was, as was indicated to Levin, only a potentiality. Moreover, as there was apparently no forewarning of Levin's imminent incapacitation, there was then no need to solidify an authorization. In those circumstances, I conclude that he indicated a wish to act in the event fraud was uncovered, and that that indication is sufficient authority for this action. The defendants' argument that, to the contrary, by "Good" Levin meant that he would assent to a suit against Regent but not against the Marders personally is mere speculation.

 Second, they argue that they are entitled to summary judgment as a matter of law. They argue essentially that the plaintiff has failed to come forward with any evidence that the defendants were negotiating for the sale which was executed on January 3, 1969, during the negotiations between Levin and the Marders, and that the non-disclosure of the "preliminary proposal" of August 21, 1968, standing alone, especially in light of the express disclosure of the firm offer for $1,250,000.00 is not a material non-disclosure. In Securities and Exchange Commission v. Texas Gulf Sulphur Co., 401 F.2d 833 (2nd Cir. 1968), it was stated, quoting List v. Fashion Park Inc., 340 F.2d 457 (2nd Cir. 1965), that,

> "[T]he basic test of 'materiality' . . . is whether 'a *reasonable* man would attach importance . . . [to a fact] . . . in determining his choice of action in the transaction in question.'" [Emphasis in original]

Further, it was stated, again citing List v. Fashion Park, Inc., *supra*, which quoted from Kohler v. Kohler Co., 319 F.2d 634 (7th Cir. 1963), that,

> "[T]his, of course, encompasses any fact . . . which in reasonable and objective contemplation *might* affect the value of the corporation's stock or securities . . . ." [Emphasis supplied in *Texas Gulf Sulphur*.]

See, generally, Matter of Cady, Roberts & Co., 40 SEC 907 (1961) and 2 Bromberg, Securities Law § 8.3. In *List*, the Court additionally distinguished materiality from reliance. The distinction is basically in that materiality is objective while reliance is subjective. The proper test of reliance, at least in the context of non-disclosure, was there stated to be,

> ". . . whether the plaintiff would have been influenced to act differently than he did act if the defendant had disclosed to him the undisclosed fact."

In the instant action the thrust of the defendants' argument is that since a firm offer of $1,250,000.00 was disclosed to the plaintiff, the non-disclosure of a mere "preliminary proposal" of

---

8. The defendants have sought to take Levin's deposition but because of his ill health, he has been protected therefrom by court order entered by the Honorable Joseph P. Willson on January 23, 1970.

$900,000.00 was not material and clearly could not have been relied upon.

I think the defendants' approach is too simplistic and overlooks not only the materials which the plaintiff has filed in response to their motions, but also some of the materials which they themselves have submitted in support of their motions. In response to the depositions and affidavit filed on behalf of the defendant, the plaintiff has come forward with an affidavit from Erik F. Lawson, Jr., Esquire. Lawson is the attorney who represented Levin throughout the negotiations which led to the "redemption" of his stock. By that affidavit the plaintiff disputes many of the facts contended for by the defendants, particularly those with respect to Levin's knowledge of the Marders' overall and ongoing efforts to sell the three corporations to an outsider. Moreover, and more important, the documents filed in this action by the defendant indicate that the firm offer of $1,250,000.00 was inherently of less moment than the "preliminary proposal" of $900,000.00. The offer of $1,250,000.00 was for a total transfer of the stock of all of the three corporations. The "preliminary proposal" on the other hand, proposed the purchase of only Lotta Cola and Regent Bottling for $900,000.00. It further proposed that the property held by Levmar be leased for "$50,000.00 per annum" over a ten year period with an option to purchase the property for "not in excess of $500,000.00".

The defendants, further, contend that they promptly responded to the proposal in August, but that when they heard nothing further by October 3, 1968, they assumed that the proponent had lost interest, and that they had in no way delayed or suspended those negotiations. This argument, however, is seemingly belied by a letter included in the materials offered by the defendants in support of their motions. The letter is from the Marders' attorney to Joseph Marder, is

dated August 29, 1968, and recites as follows:

> "I told him [Lowenthal] you'd be too busy to act upon his proposal until after Labor Day, and he was perfectly agreeable; *so the stall has worked.*" [Emphasis supplied.]

That letter also advises Joseph Marder that Lowenthal told him that "the $900,000 figure is only a negotiating figure, and indicated that [his principal was] prepared to pay more, in cash". The defendants admit that neither Levin nor his lawyer were privy to either the "preliminary proposal" or the dealings which it generated.

I think that the non-disclosure of the Lowenthal proposal may well be material particularly if Levin was not aware of the general efforts of the Marders to sell to an outsider. Further, however awkward the concept of reliance may be in a non-disclosure setting,[9] it may well be that Levin relied upon the absence of the existence of other known potential outside purchasers. Thus, I conclude that there are genuine issues of material facts, *viz.*, what were the non-disclosures and, especially, were they material or relied upon, which are best left to be resolved by the jury which has been demanded.

■ There remains the motions for summary judgment made by the third-party defendants, Apollo and Apollo-Regent. The theory of the third-party plaintiffs in joining them is that,

> "Apollo, by purchasing all the stock of Regent and Lotta Cola as it did, was assuming with Regent and Lotta Cola any and all liabilities which Regent and Lotta Cola may have had at the time of the purchase".

The theory extends to Apollo-Regent as the wholly-owned subsidiary of Apollo and the only stockholder of Regent Bottling and Lotta Cola. By their motions the third-party defendants contend essentially that in purchasing the stock of Regent Bottling and Lotta Cola it did

9. See 2 Bromberg, Securities Law § 8.6.

not assume any and all liabilities. The issue joined between the Marders and Apollo and Apollo-Regent, then, is genuine and is of an eminently material fact, *viz.*, to what did the parties agree when the stock of Regent Bottling and Lotta Cola was purchased by Apollo and Apollo-Regent.

An Order denying all the presently pending motions for summary judgment, both the original defendants' and the third-party defendants', will be entered.