Alice **HEYMAN**, Plaintiff,

v.

Michael Lee **HEYMAN** et al., Defendants.

No. 72 Civ. 3783.

United States District Court, S. D. New York.

March 27, 1973.

**960**

Stroock, Stroock & Lavan, New York City (Gary J. Greenberg, Charles G. Moerdler, Rita Hauser, Vivienne W. Nearing, New York City, of counsel), for plaintiff.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City (Simon H. Rifkind, Martin London, Leonard Unger, New York City, of counsel), for executors of the Estate of Oscar Heyman.

Olvany, Eisner & Donnelly, New York City (Gerald E. Fogerty, New York City, of counsel), for other defendants.

BAUMAN, District Judge.

This case presents a difficult question of interpreting the reach of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5, 17 C.F.R. § 240.10b–5. As happens so often when such cases are presented in this court, the ingenuity of defendants' allegedly fraudulent, scheme is matched only by the ingenuity of plaintiffs' attempt to bring it within the ambit of the statute. Before the court is a motion by all of the defendants pursuant to Rules 12(b) 1 and 12(b) 6 of the Federal Rules of Civil Procedure, to dismiss the complaint for lack of subject matter jurisdiction and for failure to state a claim on which relief can be granted.

The complaint, the allegations of which I shall assume to be true for the purposes of this motion, A. T. Brod & Co. v. Perlow, 375 F.2d 393 (2d Cir. 1967), may be briefly summarized as follows.

Plaintiff, Alice Heyman, is one of the two children of Oscar Heyman, who died on July 13, 1970. Prior to his death Mr. Heyman was president of Oscar Heyman and Brothers, a closely held New York corporation whose stock is owned entirely by members of the Heyman family. The corporation is engaged in the manufacture and sale of jewelry, which it markets through its New York, Texas, and California branch offices. It designs and produces what the complaint describes as "superior and elegant jewelry", which is sold primarily to superior and elegant shops such as Tiffany and Cartier.

On April 1, 1959, all of the stockholders of the corporation entered into an agreement requiring the corporation to purchase, upon the death of any stockholder, all of the stock which the decedent stockholder owned at its "fair value" and to use its "best efforts" to determine such fair value. (This agreement was amended as to matters not material to this action on December 1, 1959 and again on November 10, 1964).

Oscar Heyman's will explicitly affirmed this agreement. Paragraph Ninth directed the Executors to "perform and carry into effect each and all of the terms and conditions affecting [the] Estate in such Stockholders' Agreement . . . " and cautioned the Executors not "to change or vary the price or any formula to determine the price for the purchase or redemption of any of . . . [decedent's] shareholdings . . . ."

The will, dated September 10, 1969 with a codicil dated June 11, 1970, divides the residuary estate into two equal portions to be held in separate trusts for plaintiff and her brother, defendant Michael Lee Heyman. Under the terms of the trusts, they are to receive the income for life plus, at their election, annual payments from "principal equal to $5,000 or 5% of the aggregate value of the principal, whichever is greater." Each beneficiary is given a testamentary power of appointment over the principal of his or her trust. The will names Michael Heyman, George Heyman (Oscar's brother and now president of the corporation), and Sylvan Oestreicher as Executors and Michael Heyman and the Chase Manhattan Bank as trustees of the two residuary trusts.

Shortly after Oscar Heyman's death, a sale agreement was drawn up between the Executors and the corporation providing for the sale of his stock. The price was computed, it is alleged, not on the basis of the "fair value" of the corporation's stock, but rather on the "book value" of the corporation for the period ending December 31, 1969. This book value was computed at $4,600,000, and the value of Oscar Heyman's holdings, representing approximately 38% of the outstanding common stock, was fixed at $1,587,348.18.

The sale agreement was executed on August 6, 1970. Early that morning plaintiff was awakened by her brother Michael and escorted to a meeting at the corporate offices. She was there shown the agreement for the first time, admonished "as to the urgency of the matter" and told to sign it immediately. She was assured that the amount to be paid by the corporation for her father's stock was fair, and was promised that the corporate records would ultimately be made available to her. She signed then and there.

The plaintiff subsequently sought financial information from the corporation. She was refused permission to see its books and records and was only furnished with unaudited financial statements for the years 1965 through 1970. From examining them and from conversations with the Executors, plaintiff learned that the sale price for her father's stock was calculated on the basis of par value ($25 per share) for the preferred stock and book value less 10% for the common stock.

The complaint alleges four causes of action. In the first it is alleged that the purchase of stock for book value less 10% rather than its "fair value" determined by the "best efforts" of the corporation and Executors constitutes a breach of the stockholders' agreement. The second cause alleges that the sale by the Executors of the stock constituted a failure to marshal the assets of the estate and a breach of fiduciary duty. The third charges that the defendants, by undervaluing the true worth of the corporation and concealing this worth from plaintiff, were engaged in a scheme to defraud her in violation of §§ 10(b) and 20(a) of the Securities Exchange Act and its Rule 10b–5. In the fourth cause it is claimed that this course of conduct constituted a fraud and deceit upon plaintiff and a breach of fiduciary duty.

■■ The defendants have moved to dismiss the complaint, arguing that the third count fails to state a cause of action under § 10(b). If they are correct this court lacks subject matter jurisdiction over the common law causes of action set out in the first, second, and fourth counts. Where the Federal cause of action is insufficient, the State causes of action cannot be sustained under the doctrine of pendent jurisdiction. United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); Iroquois Industries v. Syracuse China Corporation, 417 F.2d 963 (2d Cir. 1969), cert. denied, 399 U.S. 909, 90 S.Ct. 2199, 26 L.Ed.2d 561 (1970); Cohen v. Colvin, 266 F.Supp. 677 (S.D.N.Y. 1967); Barnett v. Anaconda Co., 238 F. Supp. 766 (S.D.N.Y.1965).

Defendants argue that the complaint is insufficient under § 10(b) in three respects: (a) plaintiff was not a pur-

chaser or seller of securities within the meaning of Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir. 1952), cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952); (b) plaintiff's injury did not arise from her reliance on defendants' fraudulent conduct; and (c) the complaint fails to allege that a "means or instrumentality of interstate commerce" was used in connection with the fraud. I shall deal with each of those arguments in turn.

### I.

The first and most substantial of defendants' arguments requires this court to examine the continued vitality of Birnbaum v. Newport Steel Corp., supra. In *Birnbaum* our Court of Appeals held that § 10(b) of the 1934 Act[1] and Rule 10b–5[2] extended protection only to a defrauded purchaser or seller of securities and did not embrace breaches of fiduciary duty by corporate insiders resulting in fraud on those not purchasers or sellers. Defendants point out that the complaint alleges that Miss Heyman acquired only a beneficial interest in her father's stock upon his death and that she has failed to allege that she purchased or sold any stock either before or after the alleged wrongdoing by the defendants. Therefore, the argument continues, plaintiff has failed to meet the *Birnbaum* standard.

Reports of *Birnbaum's* demise[3] have been greatly exaggerated. The Supreme Court, in its most recent pronouncement on § 10(b), Superintendent of Insurance v. Bankers Life & Casualty Co., 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971), declined to renounce the *Birnbaum* doctrine. There the Superintendent of Insurance, court designated liquidator for Manhattan Casualty Company, had brought suit under § 10(b) and Rule 10b–5 against that corporation's sole shareholder (among others) for misappropriating the proceeds of a sale of government bonds held by the corporation. Begole, the shareholder, had purchased Manhattan Casualty from Bankers Life for 5 million dollars and had financed the purchase by selling Manhattan's portfolio of government bonds. It is true there is language in the Court's opinion that would suggest a modification of the purchaser/seller requirement. The Court stated, for example, that "[s]ection 10(b) must be read flexibly, not technically and restrictively. Since there was a 'sale' of a security and

---

1. Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), provides:

   "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

   \*    \*    \*    \*    \*

   "(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

2. Rule 10b–5, 17 C.F.R. § 240.10b–5, provides:

   "It shall be unlawful for any person directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

   "(a) To employ any device, scheme, or artifice to defraud,

   "(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

   "(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security."

3. See Lowenfels, "The Demise of the Birnbaum Doctrine: A New Era for Rule 10b–5", 54 Va.L.R. 268 (1968); Entel v. Allen, 270 F.Supp. 60 (S.D.N.Y.1967); Tully v. Mott Supermarkets, Inc., 337 F.Supp. 834 (D.N.J.1972).

since fraud was used 'in connection with' it, there is redress under § 10(b)." 404 U.S. at 12, 92 S.Ct. at 169. On the other hand, the Court based § 10(b) jurisdiction only on Manhattan's sale of its Treasury bonds; it held that this transaction clearly made Manhattan a seller. In so doing, it avoided premising jurisdiction on two other allegedly fraudulent transactions in which Manhattan had not been the seller, and thereby avoided confronting the *Birnbaum* problem. See 404 U.S. 6 at pp. 13–14, 92 S.Ct. 165, 30 L.Ed.2d 128, n. 10.

I agree with Judge Gurfein's observation in Haberman v. Murchison, 335 F. Supp. 286 (S.D.N.Y.1971), that after *Bankers Life*, "*Birnbaum* is left where it was." This view was fortified by the Second Circuit's decision in Drachman v. Harvey, 453 F.2d 722 (2d Cir. 1972). See also G. A. F. Corp. v. Milstein, 453 F.2d 709 (2d Cir. 1971), cert. denied, 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972), and Dyer v. Eastern Trust and Banking Co., 336 F.Supp. 890 (D. Me.1971).

▆ Plaintiff does not, concededly, ask this court to reject *Birnbaum*. Rather, she attempts to accommodate the facts of this case to either of its two recognized exceptions. She first argues that she falls within the "forced seller" exception first evolved in Vine v. Beneficial Finance Company, 374 F.2d 627 (2d Cir. 1967), cert. denied, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967) and followed in Crane Co. v. Westinghouse Air Brake, 419 F.2d 787 (2d Cir. 1969), cert. denied, 400 U.S. 822, 91 S. Ct. 41, 27 L.Ed.2d 50 (1970). *Vine* held that a minority shareholder in a "short form" merger (i. e. a merger whereby a corporation owning 95% of the shares of another can merge into the other without the consent of the remaining shareholders) is a "seller" because

he can only obtain cash for his shares. Plaintiff argues that she has been made a "forced seller" of her father's stock by virtue of the provisions of the stockholders agreement and his will which required the sale of Oscar Heyman's shares to the corporation. The analogy is unpersuasive. The term "forced seller" is a legal fiction, for the plaintiff in *Vine* was not a seller at all when he brought suit; the court denominated him a "forced seller" because his shares were utterly worthless unless he sold them. Here the shares in question have already been sold, under circumstances wholly different from those present in *Vine*. Plaintiff is in essence urging that the "forced seller" exception be broadened to encompass any sale that is "forced" by some external compulsion. I decline to read *Vine* so expansively, and prefer to regard it as a response to the unique position of a minority stockholder after a short form merger. See Greenstein v. Paul, 400 F.2d 580 (2d Cir. 1968); Hogan v. Teledyne, Inc., 328 F.Supp. 1043 (N.D.Ill.1971).

Plaintiff's effort to bring this case within the *Mutual Shares* exception to *Birnbaum* is equally unconvincing. Mutual Shares Corporation v. Genesco, Inc., 384 F.2d 540 (2d Cir. 1967), held that shareholders had standing under § 10(b) to obtain injunctive relief to prevent controlling persons from depressing the price of a corporation's stock by market manipulation, even though such shareholders had purchased their shares prior to the manipulation and had not yet sold them. The court reasoned that if the S.E.C. could seek to enjoin a continuing manipulative scheme, present shareholders were also "logical plaintiffs" to aid in enforcement of the 1934 Act by seeking such relief.[4] See also Britt v. Cyril Bath Co., 417 F.2d 433 (6th Cir. 1969); Kahan v. Rosenstiel, 424 F.2d 161 (3d Cir. 1970), cert. denied sub nom. Glen

---

4. Subsequent to *Mutual Shares*, however, our Court of Appeals deliberately emphasized that "*Birnbaum* is still the rule so far as actions for damages are concerned."

Greenstein v. Paul, 400 F.2d 580 (2d Cir. 1968); Iroquois Industries v. Syracuse China Corp., 417 F.2d 963 (2d Cir. 1969).

Alden Corp. v. Kahan, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970).

■ Plaintiff argues that *Mutual Shares* eliminated the purchaser/seller requirement when injunctive relief is requested and contends that she has standing at least to maintain her claims for equitable relief.[5] But she fails to recognize that cases such as *Kahan* and *Mutual Shares* involved efforts to enjoin continuing deceptive practices where the resultant loss to the stockholders had not yet occurred.[6] In fact, it has already been held in this district that *Mutual Shares*, while it permitted a shareholder to seek injunctive relief against a threatened fraud, has no application where the alleged fraudulent exchange has been fully consummated. Berne St. Enterprises, Inc. v. American Export Isbrandtsen Co., CCH Fed.Sec.L.Rep. ¶ 92,-711 (S.D.N.Y.1970) (Mansfield, J.). Here, therefore, plaintiff's claim for injunctive relief comes too late; the fraud was consummated on August 6, 1970 when Oscar Heyman's shares were resold to the corporation by his Executors. I adopt Judge Mansfield's holding. To rule otherwise would be to suggest that *Birnbaum* could be discarded whenever a complaint contained some prayer for equitable relief.[7]

■ Despite plaintiff's failure to accommodate her cause of action to either of these recognized exceptions to *Birnbaum*, I find that she nonetheless has standing to sue under § 10(b) and Rule 10b–5. I reach this conclusion because, after a careful re-examination of

*Birnbaum*, I am convinced that the instant case is not one to which the strict purchaser/seller limitation is applicable or appropriate. It is first necessary, however, to review that case and to understand what I believe to be the limited nature of its holding.

The facts of *Birnbaum*, briefly, are these. The plaintiffs, minority shareholders of Newport Steel, had brought suit on behalf of both the corporation and the class of stockholders similarly situated. They alleged that Feldmann, Newport's controlling stockholder, had rejected a favorable merger offer from Follansbee Steel in order to sell his stock to the Wilport Company at a substantial premium. The complaint charged that misrepresentations had been made to Newport shareholders before and after the sale of Feldmann's stock to Wilport and this constituted a fraud in connection with the sale of that stock within the meaning of § 10(b). The District Court and the Court of Appeals rejected this contention and denied plaintiffs standing to sue. The Second Circuit held that § 10(b) and Rule 10b–5 were aimed only at frauds perpetrated upon purchasers or sellers of securities and that they did not embrace breaches of fiduciary duty by corporate insiders resulting in fraud upon those who were not purchasers or sellers.

The purpose of the purchaser/seller requirement announced in Birnbaum is reasonably clear. It was devised to prevent the use of § 10(b) as a vehicle for suits based on mere corporate misman-

---

5. The complaint, to be sure, contains many novel requests for relief. This court is asked, inter alia, to enjoin the Executors' accounting proceeding in the Surrogate's Court, to remove the Executors of Oscar Heyman's estate, and to remove one of the trustees of the residuary trust. If necessary, I shall consider the propriety of assuming jurisdiction over those pendent claims at an appropriate time. See United Mine Workers v. Gibbs, 383 U.S. 715 (1966) at 726–727, 86 S.Ct. 1130, 16 L. Ed.2d 218.

6. On the question of injunctive relief, see generally Kellogg, "The Inability to Ob-

tain Analytical Precision Where Standing to Sue under Rule 10b–5 is Involved", 20 Buffalo L.R. 93 (1970), at 103–108.

7. I therefore find myself agreeing with Kellogg, supra, at note 6, where he states: "[i]f the allegation (or the availability) of retrospective or prospective injunctive relief would be sufficient to permit a non-purchaser or non-seller to sue, even though such relief would not be addressed to curbing a continuing wrong or absolving it altogether, the current 'injunctive relief exception' to the *Birnbaum* doctrine would largely envelop the rule." 20 Buffalo L.R. at 107.

agement, thus permitting any shareholder to bring a Federal action whenever fraud or self dealing could be alleged. An obvious albeit unstated concern of the *Birnbaum* court was that the Federal Courts not be buried under an avalanche of litigation by defrauded shareholders, a concern which has frequently been reiterated. For example, in O'Neill v. Maytag, 339 F.2d 764 (2d Cir. 1964), affirming 230 F.Supp. 235 (S.D.N.Y. 1964), Judge Lumbard justified the *Birnbaum* restriction as follows:

> "There may be difficulties in drawing this line where as is alleged here, securities transactions are part of an internal struggle for corporate control. But these difficulties do not justify our treating the section, or rule, as a mandate to inquire into every allegation of breach of fiduciary duty respecting issuance or sale of corporate securities."

I conclude that the policy which *Birnbaum* serves does not require that I deny this plaintiff standing. It is true, of course, that insofar as she never owned shares of Oscar Heyman and Brothers, she could not be a seller; she is merely the beneficiary of a trust funded by the sale of those shares. Although not the seller, she was one who immediately stood to gain or lose by the sale; it was for her benefit (and that of her brother) that the sale was made. In cases such as *Birnbaum* and *Mutual Shares*, it must be remembered, plaintiffs were not only non-sellers; they were not involved, directly or indirectly, in a sale. The sales, in each case, had been concluded between defendants and third parties. Here, plaintiff's connection with the sale is much closer; although plaintiff was not the nominal seller, she was the beneficiary of the sale. That is a nexus missing in the line of cases which follow *Birnbaum*. In conferring standing on this plaintiff, the court is mindful of the admonition of our Court of Appeals in Crane v. Westinghouse Air Brake, supra, 419 F. 2d at 798, that the purchaser/seller requirement be interpreted so that the broad design of the 1934 Act, to prevent inequitable and unfair practices in securities dealings not be frustrated by novel or atypical transactions. I am convinced that conferring standing here furthers the design of § 10(b) in preventing fraud "in connection with" the sale of a security but does no violence to the purpose of *Birnbaum*, which was to foreclose suits against corporate mismanagement unrelated to securities transactions.

Although this case presents an unusual § 10(b) claim, there is some support for the conclusion I have reached. In Bosche v. Louart Corp., CCH Fed.Sec.L. Rep. ¶ 92,231 (N.D.Cal.1968), plaintiff had purchased shares of a company which he subsequently transferred to a revocable trust of which he was grantor, beneficiary, and trustee. The trust later sold the shares and plaintiff subsequently brought a § 10(b) action against various defendants who had purchased the company's stock. The court held that the existence of the trust did not deprive plaintiff of standing, noting that the trust had been created solely for tax purposes, and that plaintiff retained both the right to receive income on the trust property and the power to withdraw trust property. The court concluded that "it would be exalting form over substance" to hold that the sale by the trust was not plaintiff's sale.[8] The facts of

---

8. I am aware that in similar circumstances one District Court has reached an opposite conclusion. In Rippey v. Denver United States National Bank, 260 F.Supp. 704 (D.Colo.1966), the plaintiffs were contingent beneficiaries under two testamentary trusts, of which the defendant bank was a successor trustee. They sued individually and derivatively on behalf of the trust, alleging that the bank had sold 17,000 shares of stock, a trust asset, at a price of $3.5 million below its actual value. Plaintiffs had argued, in support of their right to maintain a direct action, that the test for determining who is the defrauded seller should be the person who suffers from the fraud. The court acknowledged that the argument had "a measure of logic" but found it inconsistent with the mandate of § 10(b) and Rule 10b–5. I believe this analysis to be incorrect and decline to follow it.

*Bosche* are admittedly far more compelling than those of the case at bar: Miss Heyman obviously did not have the control over the stock that Mr. Bosche did. I rather cite *Bosche* in support of the proposition that in § 10(b) cases courts should not be loath to look behind the legal technicalities of a transaction in order to protect those whose interests the statute was designed to safeguard.[9] See also Cambridge Capital Corp. v. Northwestern National Bank of Minneapolis, 350 F.Supp. 829 (D.Minn.1972).

In SEC v. National Securities, Inc., 393 U.S. 453, at 465, 89 S.Ct. 564 at 571, 21 L.Ed.2d 668 (1969) the Supreme Court warned that in § 10(b) cases "glib generalizations and unthinking abstractions are major occupational hazards." The "purchaser/seller" formula of *Birnbaum* is often invoked unthinkingly, in apparent disrégard of the purpose for which the *Birnbaum* court employed it. I do not believe that any policy invoked in *Birnbaum* is violated by conferring standing on this plaintiff, and I therefore hold that she does have standing even though her status does not fit comfortably within the rubric of "seller".[10]

## II.

Alternatively, defendants argue that even if there were misrepresentations regarding the value of Oscar Heyman's stock or the fair value of the corporation's inventory, such misrepresentations did not cause or in any way bring about the sale of the stock. They contend that the stockholders' agreement and Oscar Heyman's will required the Executors to sell the stock and the corporation to buy. They point out that Miss Heyman's consent to the sale was not required either by the will or the Shareholders Agreement, and that she was in no respect a party to the allegedly fraudulent sale. Put less delicately, defendants argue that because they possessed the raw power to effect the transaction, any deception resulting in the diminution of Miss Heyman's trust is immaterial. There was no causal connection between the deception and plaintiff's injury, they contend, and such connection is required by § 10(b) and Rule 10b–5.

As authority for the proposition that the deception must be the proximate cause of the injury in a § 10(b) action, defendants rely on the line of cases commencing with Barnett v. Anaconda Co., 238 F.Supp. 766 (S.D.N.Y.1965). In

9. The defendants have also directed this court's attention to the following passage in Schoenbaum v. Firstbrook, 405 F.2d 200 (1968) at 212:

   "However, the purposes of the Securities Exchange Act, and more particularly, § 10(b), would normally not be furthered by permitting persons on whose behalf others buy, sell and trade to bring actions under § 10(b) against their agents. For example, the beneficiary of a trust agreement does not have an implied civil cause of action under § 10(b) and Rule 10b–5 against a trustee who, with full knowledge of all material information, sells shares from the trust corpus in an arm's length transaction for what the beneficiary considers to be inadequate consideration. If the trustee made a poor decision after considering the material information, the beneficiary's loss is not of the sort which § 10(b) was meant to prevent and even though a literal interpretation of the language in Rule 10b–5 could cover the trustee's acts, the beneficiary is not entitled to bring a civil action in reliance upon § 10(b)'s criminal liabilities."

   To begin with, the passage is, in the context of the opinion, pure dictum. More importantly, the court makes reference to an arm's length transaction by a trustee. The transaction in the case at bar, wherein one of the Executors selling the shares was also sitting on the other side of the table as president of the corporation, can hardly be characterized as arm's length.

10. Nothing in what I have said should be construed as endorsing plaintiff's contention that she may maintain a *derivative* action on behalf of the estate. I am not convinced by plaintiff's argument that such an action is closely analogous to a shareholders' derivative suit. See Rippey v. Denver National Bank, supra, note 8, at 715.

*Barnett,* plaintiff alleged that Anaconda, the owner of 73% of the shares of a subsidiary, had engaged in a scheme to deprive plaintiff, a minority shareholder in that subsidiary, of the value of his shares. The essence of the scheme was the issuance of a misleading proxy statement in support of the dissolution of the subsidiary. Under Delaware law only a two-thirds vote was required for approval, and at the stockholders' meeting, Anaconda cast all of its shares for the dissolution. The District Court held that the complaint failed to state a claim under either § 10(b) or § 14(a) of the 1934 Act, noting that Anaconda could have consummated the transaction regardless of the minority's wishes. Hence the alleged deception of the minority was irrelevant in that it did not contribute to the damage which the minority claimed to suffer because of the dissolution.

The *Barnett* case has been cited frequently. See Hoover v. Allen, 241 F. Supp. 213 (S.D.N.Y.1965); Robbins v. Banner Industries, 285 F.Supp. 758 (S. D.N.Y.1966); Adair v. Schneider, 293 F.Supp. 393 (S.D.N.Y.1968); Weiss v. Sunasco Incorporated, 295 F.Supp. 824 (S.D.N.Y.1969); Ross v. Longchamps, 336 F.Supp. 434 (E.D.Mo.1971); Lewis v. Bogin, 337 F.Supp. 331 (S.D.N.Y. 1972). Defendants argue that the principle which *Barnett* established, i. e. that the deception must be the "but for" cause of the injury, defeats plaintiff's claim in the case at bar.

There is, however, a competing line of authority. Laurenzano v. Einbender, 264 F.Supp. 356 (E.D.N.Y.1966), is factually indistinguishable from *Barnett.* The defendants there too promulgated a misleading proxy statement but were able to effect their scheme without the votes of the deceived minority. Judge Dooling refused to follow *Barnett,* reasoning that "[i]t is not . . . to be assumed without evidence that solicitation of proxies was a gratuitous and,

therefore, purposeless and legally inert." He further noted that "[s]uch seemingly pointless approbations have their uses." *Laurenzano,* too, has a following. See Globus v. Jaroff, 271 F.Supp. 378 (S.D. N.Y.1967); Weber v. Bartle, 272 F. Supp. 201 (S.D.N.Y.1967); Swanson v. American Consumer Industries, 415 F.2d 1326 (7th Cir. 1969).

■ I am unpersuaded by defendants' insistence that *Barnett* is the law in this court. They must of course concede that this specific question has been left open by the Supreme Court. In Mills v. Electric Autolite, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970) at 385, fn. 7, the Court declined to choose between the competing lines of authority represented by *Laurenzano* and *Barnett* [11]. Because I regard the question as an open one, I choose to follow what I consider the better reasoning of *Laurenzano* and its progeny.

*Laurenzano* implicitly holds that the interpretation of "proximate cause" in *Barnett* is much too narrow, and that minority shareholders have available to them means of opposing even those with the naked strength to consummate a fraudulent transaction. This view was well articulated in a comment highly critical of *Barnett,* Note "Shareholders' Derivative Suit to Enforce a Corporate Right of Action against Directors under SEC Rule 10b-5", 114 U.Pa.L.R. 578 (1966). *Barnett* holds that a deception of a minority by a majority is causative only if the fraudulent transaction was preventable by "internal corporate procedures." The author of the Pennsylvania note finds *Barnett's* distinction between internal and external procedures insupportable; he argues that "[i]t is probable that defendant directors in Barnett tried to deceive the minority, whose votes they did not need, to keep them from contesting their acts, which the court assumed to be illegal under state law." Judge Dooling and

11. In Swanson v. American Consumer Industries, 415 F.2d 1326 (7th Cir. 1969), the Seventh Circuit, at p. 1332, fn. 6,

reached a tentative conclusion that *Barnett* was no longer the law in this Circuit.

the author of the *Pennsylvania* note thus reached similar conclusions about *Barnett*; the potential victim of a fraudulent transaction may have recourse to measures other than the casting of proxies, and the *Barnett* court failed to consider such measures.

The applicability of a more expansive view of causation to the case at bar is clear. Miss Heyman, to be sure, was not a party to the resale of her father's shares, and could not have prevented the transaction merely by withholding her consent. However, there may have been other avenues available to her. Furthermore, the function of Miss Heyman's acquiescence in the transaction is far from clear on the record before me. Although defendants now argue that her consent was mere window dressing, the complaint portrays them as aching for it. For instance, at the time of the transaction, defendants were sufficiently concerned to awaken Miss Heyman abruptly one morning and order her to the corporation's offices without any prior notice. She was there "exhorted to sign at once." (Complaint, pp. 6–7). Why this unseemly haste if her consent was as irrelevant as defendants now allege? The papers before me do not even hint at an answer; they recall Judge Dooling's observation, made in a different context, that "[s]uch seemingly pointless approbations have their uses." Laurenzano v. Einbender, supra, 264 F. Supp. at 361.

There is yet another reason for rejecting the defendants' argument that deception must be a proximate cause of the injury for liability to attach under § 10(b). One recent commentator [12] has suggested that *Bankers Life* effectively overrules the *Barnett* line of cases. The Court there held that invocation of § 10(b) in cases of fraud against a corporation need not be conditioned on a showing that shareholders or directors have been deceived; the statute can be invoked as long as there are corporate creditors deceived by the plot. *Bankers Life,* supra 404 U.S. at p. 12, 92 S.Ct. 165. Such parties were no more capable of preventing the Manhattan bond sale than Miss Heyman was of blocking the resale of her father's stock. The Court by implication rejected the argument that the possession of power to effect a transaction insulates the perpetrators against subsequent charges of fraud. Because the Court did not dwell on this point, and did not even refer to the *Barnett* line of cases, one cannot be confident that it intended to repudiate them. It is however reasonably clear that *Bankers Life* comes down on the side of the broader view of causation that I have adopted.

### III.

Defendants finally urge that the complaint be dismissed because it fails to allege that any means or instrumentality of interstate commerce was used in connection with the alleged fraudulent transaction. This argument attempts to exploit a certain imprecision in the pleading,[13] whereby plaintiff failed to allege with adequate specificity that the instrumentalities of interstate commerce were used. Plaintiff in return submits an affidavit of one of her attorneys, characterized as "in the nature of a bill of particulars", alleging other instances in which the telephone or the mails were used by defendants in furtherance of the fraud. The affidavit also states that plaintiff is prepared to amend the complaint to incorporate the allegations of the affidavit. In their re-

---

12. Note, The Supreme Court, 1971 Term, 86 Harvard L.R. 1, at 259 et seq.

13. Defendants argue, rather captiously, that the complaint itself demonstrates that Federal jurisdiction is lacking. They point to that part of the complaint which describes the events of August 6, 1970:

"Early that morning, shortly after 8:30 o'clock, *without prior telephone or written notice,* the plaintiff's brother stopped at her residence and informed her that she was to get dressed and accompany him downtown to an important meeting at the corporation offices." (Complaint, p. 6).

ply *memorandum*, defendants argue that (a) the phone conversations set forth in the affidavit were intrastate; and (b) they did not play a "material" role in the transaction.

■ Defendants' first argument has been frequently made and rejected with comparable frequency. It has been pointed out, for example, that in § 10(b) "instrumentality" is modified by the phrase *"of* interstate commerce", not *"in* interstate commerce", and therefore intrastate telephone calls are sufficient to confer jurisdiction. Ingraffia v. Belle Meade Hospital, 319 F.Supp. 537 (E.D. La.1970). This is the view of the vast majority of courts who have passed on the question. See Levin v. Marder, 343 F.Supp. 1050 (W.D.Pa.1972); Myzel v. Fields, 386 F.2d 718 (8th Cir. 1967), cert. denied 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968); Bredehoeft v. Cornell, 260 F.Supp. 557 (D.Or.1966); Nemitz v. Cunny, 221 F.Supp. 571 (N. D.Ill.1963); Lennerth v. Mendenhall, 234 F.Supp. 59 (N.D.Ohio 1964); Hooper v. Mountain States Securities Corp., 282 F.2d 195 (5th Cir. 1960), cert. denied, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed. 2d 693 (1961); Lawrence v. SEC, 398 F.2d 276 (1st Cir. 1968); 6 Loss 3747–8. *Per contra,* Burke v. Triple A Machine Shop, 438 F.2d 978 (9th Cir. 1971); Rosen v. Albern Color Research, 218 F.Supp. 473 (E.D.Pa.1963).

■ As to the second of defendants' arguments, it is well settled that the fraud itself need not be transmitted through the jurisdictional means. All that is necessary is that the designated means be used in some phase of the transaction, which need not be the part in which the fraud occurs. See Levin v. Marder, supra; Matheson v. Armbrust, 284 F.2d 670 (9th Cir. 1960), cert. denied, 365 U.S. 870, 81 S.Ct. 904, 5 L.Ed.

2d 860 (1961); Ellis v. Carter, 291 F.2d 270 (9th Cir. 1961); Creswell-Keith, Inc. v. Willingham, 264 F.2d 76 (8th Cir. 1959); Blackwell v. Bentsen, 203 F.2d 690 (5th Cir. 1953); Fratt v. Robinson, 203 F.2d 627 (9th Cir. 1953); Kane v. Central American Mining and Oil, 235 F.Supp. 559 (S.D.N.Y.1964); U. S. v. Robertson, 181 F.Supp. 158 (S.D.N.Y. 1959); 3 Loss 1519–1528; 2 Bromberg § 11.2 pp. 245–6.

■ Even assuming that the pleadings are technically defective in failing to allege with specificity the use of instrumentalities of interstate commerce, dismissal on that ground would be unwarranted. A similar argument for dismissal was, for example, rejected by Judge Palmieri in Filmways, Inc. v. Artistic Liquidating Corp., CCH Fed.Sec. L.Rep. ¶ 92,332 (S.D.N.Y.1969). He noted that the many pretrial techniques of discovery and inspection would afford a sufficient opportunity to ascertain the extent of the use of the telephone and the mails and concluded, as I do here, that the plaintiffs' failure to set out with precision defendants' use of these instrumentalities is a defect easily remedied and one which should not bar their suit.

## IV.

■ Because of my ruling on the motion to dismiss the § 10(b) claim, it is clear that defendants' motion to dismiss the claim under § 20(a) of the 1934 Act, 15 U.S.C. § 78t(a),[14] must also be denied. That statute imposes liability on any one who controls another person found liable under other provisions of the Act, here, § 10(b). Defendants, however, do not rely solely on the legal insufficiency of the § 10(b) claim in arguing that the § 20(a) claim should be dismissed. They contend further that

14. § 20(a) provides:
"Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

those directors of the corporation named in the complaint but not mentioned as participating actively in the scheme should be entitled to a defense of good faith. I make no ruling on this contention here except to note that this is obviously a factual argument which is inappropriate in a Rule 12(b) motion, which tests only the legal sufficiency of the complaint.

For all of the reasons herein stated, the motion of defendants to dismiss the complaint for lack of subject matter jurisdiction and for failure to state a cause of action is hereby denied.

It is so ordered.