R. Glen **FENSTERMACHER**

v.

**PHILADELPHIA NATIONAL BANK**
**and Carson Investment Company.**

**Civ. A. No. 72–2233.**

United States District Court,
E. D. Pennsylvania.

Nov. 20, 1972.

Morris R. Brooke of Drinker, Biddle & Reath, Philadelphia, Pa., for plaintiff.

John R. McConnell, of Morgan, Lewis & Bockius, Philadelphia, Pa., for P. N. B.

John P. Mason of Dechert, Price & Rhoads, Philadelphia, Pa., for Carson.

MEMORANDUM AND ORDER

JOHN MORGAN DAVIS, District Judge.

The plaintiff has filed a Motion for a Preliminary Injunction to enjoin the

Carson Investment Company (CICO) from transferring 21,600 shares of the capital stock of the Fidelity National Bank of Pennsylvania (FIDELITY) which had been transferred to CICO by the Philadelphia National Bank (PNB). A hearing was held on November 14, 1972 and the following facts were determined:

PNB had made a loan in which the shares of Fidelity were used as collateral. The obligors were having difficulty in making the required payments. The payments were due in February, 1972 and PNB gave them a thirty day extension. In August, 1972 PNB demanded payment and the obligors did not make the required payment. Finally, in the early part of October, 1972, PNB advised the obligors that they would sell the stock pursuant to their rights as a secured creditor.

There had been some inquiry by CICO to Charles Pancoast, Senior Vice-President of PNB, on September 28, 1972 as to the purchase of the stock for $38.00 a share. However, Mr. Pancoast told CICO that they would have to contact the obligors of the loan. On October 26, 1972 the bank decided that they would sell the stock. The bank had received a list of ten to fifteen names of possible purchasers from one of the obligors' attorney. The bank sent out a letter which listed the conditions of the sale (P-1) dated October 26, 1972 to the plaintiff, CICO and other individuals. The conditions of the letter were as follows:

October 26, 1972

CONDITIONS OF PROPOSED PRIVATE SALE OF 21,600 SHARES OF THE CAPITAL STOCK OF FIDELITY NATIONAL BANK OF PA.

To Those Interested in the Proposed Private Sale by the Philadelphia National Bank of 21,600 Shares of the Capital Stock of Fidelity National Bank of Pa., Williamsport, Pa.:

You are hereby notified of the following conditions to be observed in connection with the proposed private sale by this Bank of the collateral pledged with it under a certain loan of February 25, 1971, being 21,600 shares of the capital stock of Fidelity National Bank of Pa.:

1. This Bank will entertain sealed bids for the purchase of the shares. All such bids must be received at the desk of Charles E. Pancoast, III, Senior Vice-President, at the Main Office of this Bank, Broad and Chestnut Streets, Philadelphia, not later than noon on Thursday, November 9, 1972.

2. No bid for less than all of the 21,600 shares will be entertained.

3. All sealed bids must be accompanied by a certified check payable to the order of this Bank in the amount of 10% of the bid. Said amount will constitute partial payment if the bid is accepted and the purchase completed; will be returned if the bid is not accepted; and will be retained by this Bank as liquidated damages in the event that the bid is accepted but the bidder fails to complete his purchase in accordance with these conditions of sale.

4. The high bidder meeting the foregoing conditions will, subject to paragraph 8 below, be promptly notified of acceptance of the bid; whereupon the remainder of the purchase price will be payable by receipt at this Bank as aforesaid, within five business days after such notification is given to the successful bidder, of a certified check payable to the order of this Bank in the amount of the unpaid balance.

5. Consummation of the contract of sale will be made immediately upon receipt of the full bid price by delivery of the single stock certificate for 21,600 shares and a blank stock power executed by all five registered owners of the stock, but without delivery of a bill of sale, without guarantee of signatures, without payment of any transfer or other tax, and without representation or warranty by this Bank. Reference is made to the Uniform Commercial Code (Sections 8–301 and

9–504) for a statement as to the rights received by the purchaser and the discharge of the security interest of this Bank.

6. In accordance with the terms of the agreement between this Bank and its borrowers in the loan for repayment of which the stock has been pledged, this Bank has given notice to Fidelity National Bank of Pa. that this Bank has exercised its right to vote the shares. Should there be a meeting of the shareholders of Fidelity National Bank of Pa. for which the record date for determination of shareholders entitled to vote is a date prior to that of registration of the shares on the records of Fidelity National Bank of Pa. in the name of the successful bidder, this Bank will execute a proxy in favor of or in accordance with the written directions of the purchaser, provided that the purchaser has completed his purchase and received delivery of the shares as mentioned above.

7. By the act of submitting a bid the bidder waives any right to a statement by this Bank of such knowledge as this Bank may have concerning Fidelity National Bank of Pa.

8. This Bank reserves the right to waive any irregularity in a bid and to reject any and all bids submitted to it.

9. All bids shall be submitted by filling in the appropriate blanks below and signing the form in which they appear.

### THE PHILADELPHIA NATIONAL BANK

[　(sgd). 　Charles E. Pancoast 　]
　　　Senior Vice President
　　　　, 1972

The undersigned hereby submits a bid of $　　　, accompanied by certified check of 10% thereof, upon the foregoing stated conditions which have been read.

(signature) ————————————

(print name) ————————————

(address) ————————————

On October 27, 1972 CICO offered $40.00 a share, but this offer was turned down by the bank. The bank made a counter-offer of $991,000.00 or approximately $46.00 a share. This counter-offer was predicated upon one of the original obligors contributing $100,000 and additional conditions which had to be met by CICO. CICO insisted that they would buy the shares if the conditions could be met, but only if the bank would not expose the stock to an open bid.

There had been some conversations between the plaintiff, R. Glenn Fenstermacher, and the bank during this period. On or about October 17, 1972 the plaintiff made an offer of $40.00 a share, but this was rejected by the bank. At that time, the plaintiff told Mr. Pancoast that this was the highest figure he would bid. Mr. Pancoast returned a phone call to the plaintiff on October 27, 1972, but Mr. Pancoast was informed that Mr. Fenstermacher was in Florida. This was the last communication the bank had with the plaintiff until November 10, 1972.

The bank decided to run advertisements in various newspapers to sell the stock since they were not sure of CICO being able to meet the price of $991,000 or approximately $46.00 a share and the other conditions which the bank had imposed. The advertisements appeared in various papers at different dates but they ran generally from November 3rd through the 8th, 1972. All the advertisements were the same and the following is an example of one of the advertisements:

NOTICE OF PROPOSED SALE OF STOCK

The Philadelphia National Bank, Broad and Chestnut Streets, Philadelphia, Pa. proposes to entertain sealed bids for the purchase of 21,600 shares of the capital stock of Fidelity National Bank of Pa., Williamsport, Pa. to be received at the desk of Daniel H. Ort at the Philadelphia National Bank not later than noon on Thursday, November 9, 1972. All bids must be submitted on forms provided by the

Philadelphia National Bank stating the conditions of sale and will be subject to those conditions. Copies of the bid forms and the conditions of sale may be obtained by calling Daniel H. Ort, (215) 629–3622 or by writing to him at the Philadelphia National Bank, Philadelphia, Pa. 19101.

The Philadelphia National Bank

It should be noted that the ad makes reference to the bid form which was the letter of October 26, 1972 (P–1).

On November 9, 1972 at 11:15 A.M. PNB and CICO signed an agreement (P–2) for the sale of the stock for $991,000. This was done by the bank because CICO insisted that if the bank was going to open the bids then CICO would withdraw its offer. Mr. Pancoast testified that the bank believed that the CICO bid would be the highest. Mr. Pancoast did not believe that the plaintiff would bid any higher than $40.00 a share for two reasons: 1. plaintiff's last conversation with the bank in which he indicated that $40.00 a share was the top price he would pay and 2. the inability of the bank to contact Mr. Fenstermacher because he had left for Florida.

On November 9, 1972 at 11:55 A.M. the plaintiff's attorney hand delivered plaintiff's bid to the bank. At 12:00 P.M. the bank opened the bids and discovered that plaintiff's bid was $1,000,-000. There were only two bids, one from the plaintiff and the other from CICO. However, the bank rejected both bids because of the contract which it had signed with CICO at 11:15 A.M. The approximate market price of the stock at this time was $34.00 to $35.00 a share.

The plaintiff testified that he had not gone out and tried to purchase any other stock since November 10, 1972. No action was taken by him because he thought it would be difficult, if not impossible, to get such a block of stock which represented sixteen percent of the outstanding shares of Fidelity.

The following day on November 10, 1972 at 10:45 A.M. Robert A. Potts, Vice-Chairman of PNB, called the plaintiff to explain to him the events that had taken place. At 4:00 P.M. on November 10, 1972 the plaintiff filed a Complaint and a Motion for a Temporary Restraining Order. The case was assigned to me; however, I was not available since I was out of the Courthouse. Therefore, the parties went to the Honorable Charles R. Weiner at 4:15 P.M. in his capacity as Emergency Judge. Judge Weiner had a discussion with counsel for PNB and Mr. Fenstermacher. Judge Weiner was trying to resolve the problem without the transfer taking place, but at 6:15 P.M. the Court was advised by counsel that the transfer had taken place at 6:00 P.M. The bank and CICO rescinded their contract of November 9, 1972 and entered into a new contract (P–3) which was basically the same as the previous contract with the exception that the purchase price was now $1,001,-000 instead of $991,000 and the delivery of the stock was the same day (November 10, 1972) rather than on November 14, 1972 as provided for in the contract of November 9, 1972 (P–2).

The next day, Saturday at 10:20 A.M., Judge Weiner issued a Temporary Restraining Order enjoining PNB from selling the stock with the Order expiring on November 13, 1972. Since the transfer took place on Friday evening and the Order was signed by Judge Weiner on Saturday morning, plaintiff filed an Amended Complaint along with a Motion for a Temporary Restraining Order naming the Carson Investment Company as an additional defendant. On November 13, 1972 this Court had a conference in chambers with the hope of resolving the problem, but this could not be done because of the complexities of the case. Therefore, on November 14, 1972 this Court held an extensive hearing on a Motion for a Preliminary Injunction with all parties being represented by very able counsel. This has been stipulated by counsel (Docket No. 7).

The plaintiff predicates jurisdiction upon 15 U.S.C. §§ 78j and 78aa, and 28 U.S.C. §§ 1331 and 1337. PNB asserts that this Court lacks subject matter ju-

risdiction and has filed a Motion to Dismiss.

There are two issues to which the Court must address itelf. First, whether or not there was a contract between PNB and the plaintiff. Secondly, whether or not there was any violation of the Securities and Exchange Act of 1934.

■ There is no dispute as to the statement in the letter of October 26, 1972 (P–1), that is: "This Bank reserves the right . . . to reject any and all bids submitted to it." This statement is a manifestation by the bank of preliminary negotiations. The Restatement of Contracts § 25 provides:

If from a promise, or manifestation of intention, or from the circumstances existing at the time, the person to whom the promise or manifestation is addressed knows or has reason to know that the person making it does not intend it as an expression of his fixed purpose until he has given a further expression of assent, he has not made an offer.

It is evident that the bank did not make an offer, but merely proposed an invitation to bid with the right to reject any bid. See Fraim v. Lincoln University, 428 Pa. 436, 239 A.2d 305 (1968); Rissmiller v. Evangelical Lutheran Congregation, 268 Pa. 41, 110 A. 740 (1920); Jaxtheimer v. Sharpsville Boro., 238 Pa. 42, 85 A. 994 (1913) and Leskie v. Haseltine, 155 Pa. 98, 25 A. 886 (1893).

■ The bank rejected all bids on November 10 at 12:00 P.M. However, the principal conditions of the bank to dispose of the stock is limited to the requirement that it proceed in "good faith" and in a "commercially reasonable manner", 12A P.S. §§ 9–504, 9–507. The chronological sequence of events which took place does show that the bank acted in accordance with the Uniform Commercial Code (U.C.C.) provisions. Mr. Pancoast along with Mr. Potts decided to sell to CICO since the plaintiff indicated to Mr. Pancoast that $40.00 a share would be his top price. In addition, the bank could not get in touch with the plaintiff.

It is clear that the bank saw that this was the only concrete opportunity for it to get the highest price which was possible, that is $46.00 a share. The bank knew that CICO would not bid any higher than its bid of $991,000. Along with the conditions which CICO had imposed that it would withdraw its bid of $991,000, the bank did act in a "commercially reasonable manner." This manner of selling the stock is approved by the U.C.C. In 12A P.S. § 9–507(2) it states in part:

(2) The fact that a better price could have been maintained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner. If the secured party . . . sells at the price current in such market at the time of his sale . . . he has sold in a commercially reasonable manner . . . .

Here, the market price was $34.00 to $35.00 a share and the selling price to CICO was $46.00 a share. The figures speak for themselves.

The case of Jenkins Towel Services, Inc. v. Fidelity Phila. Trust Co., 400 Pa. 98, 161 A.2d 334 (1964) which involved a letter sent to individuals for the purchase of land and had a statement which allowed the person making the invitation to approve or disapprove all offers; however, Jenkins, *supra,* is not factually the same as the case which is presently before the Court. In Jenkins, *supra,* the Supreme Court of Pennsylvania held that there was an offer and not an invitation for bids because of the factual background and the letter which was sent to prospective purchasers stated certain conditions. They were: 1. "at that time (June 24, 1959) the bids will be opened and an Agreement of Sale tendered to the highest acceptable bidder, provided the offer is in excess of $92,000. cash, free and clear of any and all brokerage commissions . . . ." 2. negotiations had been going on for at least three years. The Court in Jenkins, *su-*

*pra,* cited Hilliard Estate, 383 Pa. 63, 117 A.2d 728, in which the Court in Hilliard, *supra,* held that "the circular letter, however, unequivocally stipulated that all offers were subject to the approval of the co-executors. . . . Therefore, the circular letter merely constituted an invitation to bid."

The case at bar has the same unequivocal language. Negotiations were going on for approximately one month. There was no definite figure that PNB had stated in its letter of October 26, 1972 (P–1) that it would accept. There was no contract between the plaintiff and PNB.

We now address ourselves to the second issue: was there any violation of Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j and Rule 10b–5, C.F.R. 240.10b–5.

The plaintiff contends that this Court has jurisdiction and the right to enjoin the transfer of stock predicated upon the following statutes and rule: 15 U.S.C. § 78aa:

The district courts of the United States, and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder. Any criminal proceeding may be brought in the district wherein any act or transaction constituting the violation occurred. Any suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder, or to enjoin any violation of such chapter or rules and regulations, may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found.

15 U.S.C. § 78j:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

.    .    .    .    .    .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rule 10b–5, CFR 240.10b–5:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange.

(a) to employ any device, scheme, or artifice to defraud.

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made in the light of the circumstances under which they were made not misleading or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

The plaintiff has cited Kahan v. Rosenstiel, 424 F.2d 161 (3rd Cir. 1970) and Kohn v. American Metal Climax, Inc., 458 F.2d 255 (3rd Cir. 1972). These two cases have held, *inter alia,* that one need not be a purchaser or seller in order to maintain an action predicated upon § 10(b) and Rule 10(b)–5. This Court can see no problem with the plaintiff having

standing to assert that there has been a violation of the statutes and the rule in question. However, since all parties did agree that the hearing which was held on November 14, 1972 was all the evidence that would be introduced if there would be a trial on the merits, this Court will now turn to the plaintiff's allegation that there was fraudulent conduct by PNB.

The plaintiff contends that the advertisements were fraudulent because they omitted any mention of the agreement between PNB and CICO to sell the shares to CICO for $991,000, irrespective of any bids which PNB would receive. This hypothesis by the plaintiff must be based upon the fact that at the time of the advertisements (November 3rd through the 8th, 1972) and the time before the bids were to be in the hands of the bank (November 10, 1972 at 12:00 P.M.), a contract or a scheme did in fact exist.

What the plaintiff may call a contract was only preliminary negotiations between PNB and CICO. The contract with PNB and CICO was consummated on November 9, 1972. PNB had been trying to get the highest possible price for the Fidelity stock. PNB had negotiated with the plaintiff and CICO. It had sent out the letter of October 26, 1972 (P-1) to other people who might be interested in purchasing the stock. With a market value of $34.00 to $35.00 a share and an offer of $46.00 a share from CICO along with the fact that plaintiff had indicated he would only go as high as $40.00 a share, the bank had no other recourse but to accept CICO's offer of $46.00 a share.

There was no scheme which existed between PNB and CICO. The plaintiff was aware of the fact that he was making his bid subject to the conditions of the letter of October 26 (P-1). He knew that his bid could be rejected outright by PNB. The bank did not give anyone the impression that because they were bidding, they would necessarily be awarded the right to purchase the shares.

The bank did not limit itself to the advertisement route along with the bid forms, but it tried a private sale. In fact, on October 27, 1972 Mr. Pancoast returned plaintiff's telephone call only to find out that he had left for Florida. The plaintiff knew, as a businessman and a banker, that PNB would try to get the highest price possible in any commercially reasonable manner.

The bank looked at its position at 11:15 A.M. on November 10, 1972. The bank had to ask itself this question: Should it accept a bid of $46.00 a share from CICO or forever lose the opportunity to sell at that price or wait for the bids to be opened? The choice was not a difficult one for PNB to make. The bank, being very pragmatic, decided that a "bird in the hand is worth more than two in the bush."

There are other issues which have been raised. Briefly, this Court is aware of the axiom that if the plaintiff has a legal remedy available to him, he must pursue that before he should attempt to have the court invoke its equitable jurisdiction. However, it would be very difficult for the plaintiff to purchase approximately sixteen percent of the stock in Fidelity before the shareholders meeting of November 21, 1972.

This Court would be remiss if it did not address itself to this final point. Lawyers are very technical people, that is their business and, as such, they must try to protect their clients in every manner in which they properly can. Factually, Judge Weiner's Temporary Restraining Order was entered on November 11, 1972 at 10:20 A.M. and the delivery of shares by PNB to CICO took place on November 10, 1972 at approximately 6:00 P.M. However, there were discussions going on between Judge Weiner and counsel. It is evident that counsel was in communication with their clients and they, in all likelihood, conveyed Judge Weiner's thoughts about not delivering the stock by PNB to CICO. There was no legal Contempt of Court; however, this Court would trust that if a similar situation does arise in the future,

counsel will be able to convince their clients that they should not act in such a manner.[1]

## ORDER

And now, this 20th day of November, 1972 it is hereby ordered that plaintiff's Motion for a Preliminary Injunction is denied,

It is further ordered that defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction is denied,

It is further ordered that this action is hereby dismissed for reasons which have been stated in this Memorandum,

It is finally ordered that this Court shall not stay this Order pending the appeal.

1. This Opinion constitutes the prerequisite findings of fact and conclusions of law required by Rule 52(a) of Federal Rules of Civil Procedure. 28 U.S.C. Rule 52 (a).