Thomas HIDELL and Dorothy Hidell, Plaintiffs-Appellees,

and

Harold Frieh, Intervening Plaintiff-Appellee,

v.

INTERNATIONAL DIVERSIFIED INVESTMENTS, a Delaware Corporation, et al., Defendants-Appellants,

and

Ballantrae Apartments and Louis S. Rosenbloom, Intervening Defendants-Appellants.

No. 74–1631.

United States Court of Appeals, Seventh Circuit.

Argued April 2, 1975.

Decided July 16, 1975.

---

* Of the District of Maryland, sitting by designation.

1. The truck was a total wreck.

2. A claim against Goodyear Tire and Rubber Company was dismissed before trial.

George E. Faber, Chicago, Ill., for defendants-appellants.

John Powers Crowley, Robert S. Atkins, Chicago, Ill., for plaintiffs-appellees.

Before FAIRCHILD, Chief Judge, McALLISTER,[*] Senior Circuit Judge, and STEVENS, Circuit Judge.

PER CURIAM.

■ Defendants Donald and Sally Rosenbloom and International Diversified Investments ("I.D.I.") appeal from a district court judgment that they violated § 10(b) of the Securities Exchange Act of 1934,[1] S.E.C. Rule 10b–5,[2] and § 12 of the Illinois Securities Act[3] during the solicitation of subscription agreements for the purchase of I.D.I. stock. The court awarded plaintiffs Thomas and Dorothy Hidell $25,000 and intervening plaintiff Harold Frieh $30,000. Plaintiffs also received interest, costs and reasonable attorney's fees.[4]

In late 1970 and early 1971 the Rosenblooms had spoken with Frieh about forming a real estate investment corporation, and on December 20, 1970, Frieh orally agreed to purchase 6,000 shares of stock, for $30,000. The Rosenblooms were to invest $10,000 and would receive 56,000 shares. Frieh was to become an officer and director of I.D.I. On January 13, 1971, Frieh made an initial payment of $2,500 for his shares. His check for that amount was not deposited, however, until February 12. On January 18, the Articles of Incorporation for I.D.I. were filed in Delaware; these articles authorized the issuance of 56,000 shares of stock. On that same day those shares were issued to the Rosenblooms. Subsequently, on January 25 the articles were amended by the Rosenblooms to authorize the issuance of an additional 6,000 shares, but this amendment was not filed and registered with the Delaware Secretary of State until February 22. In the interim, on February 13, Frieh paid the

[*] Senior Circuit Judge Thomas F. McAllister of the United States Court of Appeals for the Sixth Circuit is sitting by designation.

1. "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
 * * * * * *
 "(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78(j)(b).

2. "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
 "(a) To employ any device, scheme, or artifice to defraud,
 "(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, "in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5.

3. "It shall be a violation of the provisions of this Act for any person:
 "A. To sell any security except in accordance with the provisions of this Act;
 * * * * * *
 "G. To obtain money or property through the sale of securities by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading;
 * * *." Ill.Rev.Stat.1973, ch. 121½, § 137.12 (in pertinent part).
 A private cause of action for the violations specified in § 12 is provided in § 13 of the Illinois Act, Ill.Rev.Stat.1973, ch. 121½, § 137.-13.

4. The amount of attorney's fees has not, as yet, been determined. This does not affect, however, the appealability of the district court's judgment. *Swanson v. American Consumer Industries, Inc.,* 517 F.2d 555 (7th Cir. 1975).

additional $27,500 for his shares. The certificate for 6,000 shares of I.D.I. stock was issued to him on February 22.

Frieh's claims, upheld by the district court, basically centered on certain statements made to him, allegedly in violation of § 10(b) of the 1934 Act, Rule 10b–5, and § 12 of the Illinois Act, during this period. He also alleged, and the trial judge found, that I.D.I. failed to register the stock sold him as required under the provisions of § 5 of the Illinois Securities Act.[5]

On February 11, 1971, the Rosenblooms prepared a prospectus and form subscription agreement and began approaching potential investors on behalf of I.D.I. On or about February 16, plaintiffs Thomas and Dorothy Hidell, after reviewing the prospectus, executed such a subscription agreement to purchase 1,000 shares. The agreement provided that it was not to become a binding contract unless subscriptions for 20,000 shares ($500,000) were obtained prior to September 30, 1971. The Hidells paid $25,000 between January 21 and September 19 for the 1,000 shares.

By September 17, 1971, it was clear that the goal of 20 subscriptions was not going to be reached by September 30. Only six 1,000-share agreements had been obtained. Thus, on that day Donald Rosenbloom and Frieh, pursuant to a

resolution of the board of directors of I.D.I., wrote the subscribers informing them that, "We now believe that the immediate objective of I.D.I. can be achieved with equity capital of approximately $175,000 to $200,000," and that the $150,000 already provided by the six subscribers, plus the $40,000 invested by Rosenbloom and Frieh, would permit I.D.I. to commence operations.[6] The letter requested that the subscribers consent to the elimination of the 20,000 share condition.

On September 20, 1971, Donald Rosenbloom traveled to Philadelphia and convinced the Hidells to sign the amendment to the subscription agreement informing them that at that time the company had $190,000 in capital. On September 29, however, Rosenbloom entered into a repurchase agreement, on behalf of I.D.I., with Jack Dougherty, another subscriber. Dougherty had required such reassurance as a condition of consenting to the proposed amendment. The Hidells did not learn of the repurchase agreement until April 14, 1972. When they sought to obtain a similar agreement from the corporation, it was denied them, Donald Rosenbloom casting the deciding vote to break a tie among the other directors.

The district court found that the defendants violated § 10(b) of the 1934

---

**5.** Ill.Rev.Stat.1973, ch. 121½, § 137.5. The district court found that the shares were not exempt from registration under § 4 of the Illinois Act, Ill.Rev.Stat.1973, ch. 121½, § 137.4. The sale without prior registration was a violation of § 12, subd. A of the Illinois Act. *See* n. 3, *supra*.

**6.** The letter provided, in pertinent part:

"During the past several months, we have evaluated several real estate investments, and we have discussed the financing thereof with our attorneys and accountants and with various mortgage bankers and lending institutions. We now believe that the immediate objective of IDI can be achieved with equity capital of approximately $175,000 to $200,000.

"At the time we reached the above conclusion, various investors, including you, had executed Subscription Agreements for more than 6,000 shares ($150,000). Since we have

already invested $40,000, we did not and have not actively solicited additional investors, but have concentrated our efforts on possible investments.

"We are confident that $175,000 to $200,000 will be sufficient to commence operations. Our attorneys have advised us, however, that your consent must be obtained to the elimination of the condition contained in the Subscription Agreement to the effect that such Subscription Agreements do not become binding obligations unless investors have subscribed for an aggregate of 20,000 shares prior to September 30, 1971. Accordingly, we solicit your consent to the elimination of the aforesaid condition and, as soon as we have received consents from investors subscribing for not less than 6,000 shares, we will forthwith accept all Subscription Agreements then on hand and will thereafter accept additional Subscription Agreements to and until September 30, 1971."

Act, Rule 10b–5, and § 12 of the Illinois Act by affirmatively stating to the Hidells that, as of September 20, 1971, I.D.I. had a capitalization of $190,000 and by failing to disclose Dougherty's misgivings that subsequently resulted in the repurchase agreement.

## I. The Hidell Claim

Defendants argue that the statement in the September 17 letter and any oral statements made to the Hidells on September 20 that an investment of $190,-000 had been made in I.D.I. were not false when made because the repurchase agreement was not entered into until nine days after the Hidells consented to the subscription agreement amendment. Alternatively, they contend that the repurchase agreement entered into between Donald Rosenbloom and Dougherty was not a "material fact," as the term is used in Rule 10b–5 and § 12, subd. G of the Illinois Securities Act. We disagree on both grounds.

The record discloses that Donald Rosenbloom was aware of Dougherty's reluctance to sign the subscription agreement amendment before he went to Philadelphia on September 20 to meet with the Hidells. Dougherty testified that he had had conversations with Rosenbloom about a buy-back agreement prior to his receipt of the September 17 letter. Tr. 197. And Rosenbloom admitted that, although Dougherty had requested concessions prior to September 17, he never so advised the Hidells. Tr. 435. Consequently when Rosenbloom convinced the Hidells to sign the amendment, by stating that an investment of $190,000 had been made, he failed to disclose the fact that one of the subscribers had indicated that he might not so agree with a repurchase agreement. The $190,000 investment statement was, therefore, seriously misleading, even if not wholly false, when made. Whether we view this as a false affirmative statement or as an omission, Rosenbloom himself had reason to believe that it was less than a completely truthful statement of the then-current status of the corporation's financing.[7]

Having informed the Hidells that $190,000 had been invested, when he knew of Dougherty's demands and the significant likelihood that a repurchase agreement might be a condition of Dougherty's assent, we believe that Donald Rosenbloom was under an affirmative duty to notify the Hidells of the repurchase agreement on or after September 29 and to afford them the opportunity to cancel their consent to the subscription agreement amendment.[8] Similarly, Sally Rosenbloom, who signed the September 17 resolution approving the amendment to the subscription agreement, and who knew on September 29 of the repurchase agreement, was, as an officer and director of I.D.I., under the

7. The fact that Donald Rosenbloom knew of the demands being made by Dougherty at the time of the statements to the Hidells distinguishes this case from *Abrahams v. Aptman*, 1972–1973 CCH Fed.Sec.Law Rep. ¶ 93,818 (S.D.N.Y.1973), where statements, accurate when made, were subsequently rendered inaccurate by changed events. Similarly, the particular circumstances involved in *Fenstermacher v. Philadelphia National Bank*, 351 F.Supp. 1015 (E.D.Pa.1972), *aff'd*, 493 F.2d 333 (3d Cir. 1974), where the defendant was conducting private negotiations to sell shares while at the same time advertising for public bids, are quite different than those here, especially since in that case the court found that the plaintiff, an unsuccessful public bidder, knew that his bid could be rejected outright, and that the bank had not given anyone the impression that, by bidding, they would necessarily be awarded the right to purchase the shares. 351 F.Supp. at 1022. On appeal, the Third Circuit acknowledged that the bank might well have had a duty to disclose the ongoing negotiations, but denied Fenstermacher relief on other grounds. 493 F.2d 340.

8. As the Second Circuit held in *S.E.C. v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1095 (2d Cir. 1972), in the related context of a registration statement made misleading by subsequent developments:

"That these developments occurred after the effective date of the registration statement did not provide a license to appellants to ignore them. Post-effective developments which materially alter the picture presented in the registration statement must be brought to the attention of public investors."

same duty of disclosure and is similarly liable under § 10(b), Rule 10b–5, and § 12 of the Illinois Act.[9]

Defendants present us with several alternative arguments with regard to the materiality of the failure to inform the Hidells of the repurchase agreement. They agree that the test of "materiality" was properly set forth by the court in *S.E.C. v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir. 1968), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756:

> "The basic test of materiality * * * is whether a *reasonable* man would attach importance * * * in determining his choice of action in the transaction in question. . . ." This, of course, encompasses any fact " * * * which in reasonable and objective contemplation *might* affect the value of the corporation's stock or securities * * *."

Quoting *List v. Fashion Park, Inc.*, 340 F.2d 457, 462 (2d Cir. 1965), *cert. denied*, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (emphasis in original).

They argue first, however, that, because the repurchase agreement entered into between Dougherty and Donald Rosenbloom on behalf of I.D.I. was illegal, and hence unenforceable, under Delaware law, it could not have been material to a decision on the amendment to the subscription agreement. Even assuming the illegality premise, we must disagree with defendants' conclusion. For it ignores the subsequent activity concerning the repurchase of Dougherty's shares. On advice of counsel, Donald Rosenbloom gave Dougherty a second letter, dated October 1, 1971, agreeing personally to repurchase the shares. This letter was accepted by Dougherty on April 14, 1972. On September 30, 1972, Dougherty exercised his repurchase option, and on December 29, 1972, Dougherty's shares were repurchased by I.D.I. as treasury stock, with funds provided the corporation by the Rosenblooms.[10]

Thus, the record demonstrates that the Rosenblooms were willing to provide Dougherty with the assurances he sought even if it required personally guaranteeing the repurchase. The shares were repurchased, using I.D.I. funds donated by the Rosenblooms. The net effect of the transaction was that the number of outstanding shares of I.D.I. was reduced and the risk assumed by the Hidells was proportionately increased.[11] Thus, regardless of the legality of the September 29 agreements, the repurchase of Dougherty's shares in fact did take place. A reasonable man, even if he knew of the illegality, might well have attached importance to the agreement because of the possibility of just such an eventuality.

Focusing on the possible illegality of the agreement also overlooks the fact that a reasonable investor would have attached importance to the very fact that one of the five other subscribers felt the need to demand such a buy-back option as a condition to agreeing to reduce further the capitalization of the corporation. Original plans had called for the sale of 20,000 shares for a minimum capitalization of $500,000. The failure to obtain the necessary 20 subscribers mandated the reexamination of the corporation's goals which resulted in the September 17 letter and the announcement that I.D.I. could go into

---

9. *Sprayregen v. Livingston Oil Co.*, 295 F.Supp. 1376, 1378 (S.D.N.Y.1968).

10. The record is clear that the repurchase was made with an I.D.I. check and the shares became treasury stock, not assets of the Rosenblooms. Tr. 424–425.

11. Defendants argue that the repurchase benefitted the plaintiffs by "substantially increasing their proportionate interest in the corporation." Defendants' Brief at 20. Surely, however, a reasonable man would recognize the increased risk as well as the increased opportunity provided by the repurchase of the shares. In any event, whether viewed as a benefit or as a detriment, the repurchase agreement was clearly material to a decision on the amendment to the subscription agreement.

business with a capitalization of only $175,000 to $200,000. The knowledge that another of the six subscribers was having serious second thoughts about going forward with the scaled-down venture would clearly have been material to the Hidells' decision.[12]

Finally, defendants argue that, even assuming the exercise of the Dougherty option, the capitalization of the corporation would still have been $165,000, only $10,000 below the $175,000 minimum stated in the September 17 letter. It is clear, however, that, in light of the already significant reduction in planned capitalization and the fact that the September 17 letter referred to the $175,000 to $200,000 range as "sufficient to commence operations," knowledge of this further decrease would have been material to a reasonable man.[13]

■ Consequently, we conclude that the unqualified statement of defendants in the September 17 letter and of Donald Rosenbloom in his September 20 meeting with the Hidells that $190,000 had been invested in I.D.I. was material and misleading and that defendants violated § 10(b) of the 1934 Act, Rule 10b–5, and § 12, subd. G of the Illinois Act[14] by not informing the Hidells at those times of Dougherty's demands or, alternatively,

informing them of the existence of the repurchase agreement and resoliciting their assent to the subscription agreement amendment.

## II. The Frieh Claim

The district court found that defendants had made numerous material misrepresentations to Frieh in connection with his purchase of I.D.I. stock, in violation of § 10(b) of the 1934 Act, Rule 10b–5, and § 12 of the Illinois Securities Act. In addition, the court found that defendants violated § 12 of the Illinois Act by failing to register the shares sold Frieh, as required by § 5 of the Act.

■ Defendants argue that the provisions of § 10(b) of the Securities Exchange Act and Rule 10b–5 cannot apply to this transaction because defendants did not make use of any "means or instrumentality of interstate commerce" in selling these shares to Frieh. The record discloses that the entire course of negotiations between Rosenbloom and Frieh was conducted either in personal meetings in Illinois or by local telephone calls. This circuit has not yet decided whether purely local telephone calls satisfy the jurisdictional requirements of § 10(b). We need not choose between the competing authorities[15] here, however, for we

12. For this same reason, the fact that Dougherty was seeking a repurchase option which might not have been exercised did not render the information nonmaterial.

13. Nor do we think defendants can avoid liability for their failure to disclose the repurchase agreement on the theory that, as persons owing a fiduciary duty to the corporation, they had a duty to prevent dissension among the prospective shareholders. And the fact that all of the investors may have been in the same position to bargain for corporate concessions did not, on the facts of this case, obviate the duty to disclose the existence of such demands.

14. Both parties have assumed, and we agree, that § 12, subd. G of the Illinois Act should be interpreted identically with Rule 10b–5. See *Parrent v. Midwest Rug Mills, Inc.*, 455 F.2d 123, 127 (7th Cir. 1972); *Norville v. Alton Bigtop Restaurant, Inc.*, 22 Ill.App.3d 273, 280, 317 N.E.2d 384, 388 (1974). Because the Hidells formally notified the defendants of their

election to rescind the sale on May 26, 1972, within six months of learning of the existence of the repurchase agreement some time in April, 1972, they complied with the notice provision of § 13, subd. B of the Illinois Act, Ill.Rev.Stat.1973, ch. 121½, § 137.13, subd. B.

15. Compare *Burke v. Triple A Machine Shop, Inc.*, 438 F.2d 978, 979 (9th Cir. 1971); *Arber v. Essex Wire Corp.*, 342 F.Supp. 1162, 1163–1164 (N.D.Ohio 1971); and *Rosen v. Albern Color Research, Inc.*, 218 F.Supp. 473, 475–476 (E.D.Pa.1963), holding that local phone calls are inadequate, with *Lawrence v. S.E.C.*, 398 F.2d 276, 279 n. 2 (1st Cir. 1968); *Myzel v. Fields*, 386 F.2d 718, 727 (8th Cir. 1967), *cert. denied*, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143; *Heyman v. Heyman*, 356 F.Supp. 958, 969 (S.D.N.Y.1973); *S.E.C. v. Crofters, Inc.*, 351 F.Supp. 236, 256 n. 20 (S.D.Ohio 1972); *Reube v. Pharmacodynamics, Inc.*, 348 F.Supp. 900, 912 (E.D.Pa.1972); *Levin v. Marder*, 343 F.Supp. 1050, 1056 (W.D.Pa.1972); *Ingraffia v. Belle Meade Hospital, Inc.*, 319 F.Supp. 537, 538 (E.D.La.1970); *Bredehoeft v. Cornell*, 260

conclude that Frieh was entitled to relief on at least one of his Illinois Securities Act claims.[16]

Section 5 of the Illinois Securities Act, Ill.Rev.Stat.1973, ch. 121½, § 137.5, requires, in pertinent part, that all securities shall be registered with the Illinois Secretary of State prior to sale in Illinois, unless exempt under § 4 of the Act. Defendants rely on § 4, subd. M,[17] the exemption for preincorporation sales, in this case. They contend that the sale of shares to Frieh took place prior to the January 18, 1971, incorporation of I.D.I.

The record discloses, however, that although Frieh's agreement to purchase the shares took place prior to incorporation, the sale cannot be characterized as preincorporation within the meaning of § 4, subd. M. Frieh's oral agreement to purchase 6,000 shares occurred on December 20, 1970, and on January 13, 1971, his initial payment of $2,500 was made. When the articles of incorporation were filed in Delaware on January 18, however, they authorized the issuance of only 56,000 shares of stock, the shares earmarked for the Rosenblooms. It was not until the articles were amended on January 25 and this amendment was filed in Delaware on February 22 that the 6,000 shares Frieh was purchasing were even authorized to be issued. The $2,500 check given the Rosenblooms on January 13 was not deposited until February 12, and on February 13 Frieh paid the balance of $27,500. The shares were issued to him on February 22.

■ Under Illinois law, a preincorporation subscription is deemed to be an offer, irrevocable for six months, to purchase shares. The offer is normally accepted by the filing of the articles of incorporation. Ill.Rev.Stat.1973, ch. 32, § 157.16. But, a subscription for shares which are not authorized by the articles is not binding on either the subscriber or the corporation. *Great Western Tel. Co. v. Loewenthal*, 51 Ill.App. 447, 448 (1893), *aff'd*, 154 Ill. 261, 40 N.E. 318 (1894). Consequently, in this case Frieh's offer was accepted by the corporation, and the sale of the shares took place some time after the corporation was incorporated. The literal terms of § 4M's exemption do not apply to this transaction.

■ The defendants argue, however, that the definition of the term "sale" in § 2–5 of the Illinois Act includes "a contract to sell, an exchange, an attempt or an offer to sell." Ill.Rev.Stat.1973, ch. 121½, § 137.2–5. They note that in applying the protective provisions of the Act, the courts have liberally applied the "sale" definition, holding that a single installment payment (*Silverman v. Chicago Ramada Inn, Inc.*, 63 Ill.App.2d 96, 211 N.E.2d 596 (1965)), and a solicitation (*Green v. Weis, Voisin, Cannon, Inc.*, 479 F.2d 462, 465 (7th Cir. 1973)) are "sales." Thus, they conclude that a sale took place when Donald Rosenbloom solicited the purchase of I.D.I. shares by Frieh in December, 1970, and when Frieh tendered his $2,500 check in partial payment on January 13, 1971. Since both of these "sales" took place prior to the incorporation on January 18, they contend that § 4, subd. M applies.

---

F.Supp. 557, 558–559 (D.Ore.1966); *Lennerth v. Mendenhall*, 234 F.Supp. 59, 63 (N.D.Ohio 1964); and *Nemitz v. Cunny*, 221 F.Supp. 571, 574 (N.D.Ill.1963), holding such calls adequate to bring § 10(b) into play.

**16.** Even if the district court had decided at the close of the taking of evidence that it did not have jurisdiction over Frieh's federal claims, because of the local nature of the telephone calls, consideration of his state claims would have been appropriate and is appropriate by us on pendent jurisdiction grounds. *Parrent v. Midwest Rug Mills, Inc.*, 455 F.2d 123, 128–129 (7th Cir. 1972).

**17.** "The provisions of Sections 5, 6 and 7 of this Act shall not apply to any of the following transactions, except where otherwise specified in this Section 4:

* * * * * *

"M. The sale of subscriptions for, or shares of stock, of a corporation, prior to the incorporation thereof under the laws of the United States, or any state, territory or possession thereof, or of the District of Columbia, if no commission or other remuneration is paid or given directly or indirectly for or on account of such sale, and if the number of subscribers shall not exceed 25;

* * * ."

We cannot subscribe to this reading of the Act. For such an interpretation would mean that any preincorporation contact between an incorporator and a potential purchaser of a corporation's shares would immunize from § 5's registration requirement any subsequent sale of stock to that purchaser, regardless of when the sale actually takes place.

 The Illinois courts have admonished that the provisions of the Illinois Securities Act "should be liberally construed to protect the investing public from fraud and deceit in the sales of securities." *Norville v. Alton Bigtop Restaurant, Inc.*, 22 Ill.App.3d 273, 284, 317 N.E.2d 384, 391 (1974), and cases cited therein. It was in this spirit that the court in *Silverman* held that, although the solicitation and first two payments for an unregistered security fell outside the Act's three-year statute of limitations, the last payment, made within the three-year period, was by itself a "sale." Similarly, we broadly construed the term "sale" in *Green* to encompass mere solicitations within the state, where all of the other activities occurred elsewhere, because of the "paternalistic purpose" of the Illinois Act. 479 F.2d at 465.

Thus, in both these cases, expanded definitions of the concept of a sale were adopted for purposes of including certain transactions within the protections of the Act. We hardly think that defendants are entitled to rely on such a broadened definition for purposes of excluding transactions, especially when their conclusion as to when the sale to Frieh took place is so at odds with traditional state corporate law notions of the concept of a preincorporation subscription.[18] As we find that defendants violated § 12A of the Illinois Act in this regard, it is unnecessary for us to consider Frieh's other claims.

Defendants finally argue that Frieh did not comply with the requirement of § 13, subd. B of the Illinois Act that notice of the intention to rescind the sale be given within six months "after the purchaser shall have knowledge that the sale of the securities to him is voidable."[19] Frieh sent defendants his registered notice on December 27, 1973. They argue that this was clearly more than six months after he first learned of the fact that the sale was voidable.[20]

---

**18.** That the courts will not ignore a common sense approach in applying the Illinois Securities Act was further demonstrated in *Greenburg v. Wolf*, 19 Ill.App.3d 905, 312 N.E.2d 396 (1974). There plaintiffs argued that § 4, subd. M's preincorporation sale registration exemption did not apply because the corporation was never actually formed, and, hence, no sales actually took place. The Illinois Appellate Court disagreed, stating, "The language of section 4, subd. M stating the requirements for the exemption is plain, and we see nothing that would enable us to engraft the additional requirement sought by the plaintiffs." 312 N.E.2d at 398.

In addition, the intent of the framers of the Illinois Act that the exemptions found in § 4 be strictly applied is further manifested in the requirement found in § 15, subd. A that "the burden of proving such exemption shall be upon the party raising such defense." Ill.Rev.Stat.1973, ch. 121½, § 137.15, subd. A. *Gowdy v. Richter*, 20 Ill.App.3d 514, 519, 314 N.E.2d 549, 553 (1974).

**19.** "Notice of any election provided for in subsection A of this Section shall be given by the purchaser, within 6 months after the purchaser shall have knowledge that the sale of the securities to him is voidable, to each person from whom recovery will be sought, by registered letter addressed to the person to be notified at his last known address with proper postage affixed, or by personal service[.]" Ill.Rev.Stat.1973, ch. 121½, § 137.13, subd. B.

**20.** Defendants note that Frieh admitted that he first became aware of the Dougherty repurchase agreement in April of 1972. One of Frieh's other claims, which we find it unnecessary to reach in this case, was that the Dougherty agreement voided his purchase, as well as the Hidells'. *See* Section I, *supra*. Defendants argue from that that Frieh had to give notice of his intent to rescind within six months of April, 1972, and that his failure to do so prevents any subsequent action under the Illinois Act. They interpret § 13, subd. B as mandating such notice within six months of a purchaser's first learning of any reason that might void the sale; the subsequent discovery of additional grounds for voiding the sale would not, in their reading of § 13, subd. B, permit the giving of additional six months' notices. As we find that Frieh did not have knowledge

██ Frieh testified, however, that he did not learn that his purchase of I.D.I. stock was voidable for any reason until he consulted with his present attorney in November, 1973. Tr. 282. The Illinois courts have held that even though an investor might know of facts that would void his security purchase, it is only when he learns, possibly from his attorney, that those facts might have such a legal consequence that the statutory six months period begins to run. *Gowdy v. Richter*, 20 Ill.App.3d 514, 523, 314 N.E.2d 549, 556 (1974); *Curtis v. Johnson*, 92 Ill.App.2d 141, 155, 234 N.E.2d 566, 574 (1968). As the court explained in *Curtis*, 234 N.E.2d at 574:

> Knowledge that the sale is "voidable" is a mixed question of fact and law on which a layman is entitled to acquire his first knowledge from an attorney.

Consequently, we conclude that Frieh timely notified the defendants as required by § 13, subd. B, and that the district court's judgment in his favor must be affirmed.

## III. Attorney's Fees

Defendants challenge the district court's award of reasonable attorney's fees to the plaintiffs. The award was made pursuant to the authority contained in § 13, subd. A(2) of the Illinois Act, Ill.Rev.Stat.1973, ch. 121½, § 137.13, subd. A(2). Defendants note that plaintiffs have as yet not come forward with time records and other documents supporting any award of fees. As we noted above,[21] however, the district court has reserved ruling on the actual amounts to be awarded; presumably the necessary documentation will be forthcoming at such a time. At that time defendants may present any arguments concerning the excessiveness of the fees.

that the sale was voidable on any grounds until November, 1973, however, it is unnecessary for us to decide the question of the permissibility of multiple notices.

**21.** *See* n. 4, *supra.*

██ Additionally, defendants object to the award of fees where plaintiffs' counsel may have been serving on a contingent fee basis. While the record is unclear whether this in fact was the fee arrangement, the Illinois courts have not restricted recovery of fees under the Illinois Securities Act to preclude awards in such a case. *Spiegel v. Frangoulis*, 271 Ill.App. 526 (1933), relied on by the defendants in this regard, has been disapproved in the Securities Act context in the recent decision in *Gowdy v. Richter*, 20 Ill.App.3d 514, 530, 314 N.E.2d 549, 561 (1974).

## IV. The Counterclaim

██ Defendants lastly complain of the district court's refusal to allow I.D.I. to file a permissive counterclaim, based on alleged advances against commission payments made to Frieh and Thomas Hidell, submitted almost one month after trial. Fed.R.Civ.P. 13(f) provides:

> When a pleader fails to set up a counterclaim through oversight, inadvertence, or excusable neglect, or when justice requires, he may by leave of court set up the counterclaim by amendment.

It is clear in this case that I.D.I. was aware of the facts underlying the proposed counterclaim well in advance of trial. Yet it chose never to plead it. Although evidence of such payments by I.D.I. to Frieh and Hidell was introduced, we cannot be certain that, because of the failure to plead the counterclaim, the trier of fact was presented all of the evidence concerning the alleged agreement between these parties over commission payments.[22] Under these circumstances, we cannot say that justice required the allowance of the amendment at such a late date or that the district court's action in denying the motion to amend constituted an abuse of

**22.** I.D.I. cannot rely upon the fact that Frieh was permitted to amend his complaint to conform to the proof after trial, pursuant to Fed. R.Civ.P. 15(b), since this amendment did not even arguably interject a new legal issue that was not fully explored at trial.

**540**

discretion.[23] *Kirbens v. Wodis*, 295 F.2d 372, 375 (7th Cir. 1961); *Tyne v. National Supply Co.*, 280 F.2d 878, 882–883 (7th Cir. 1960), *cert. denied*, 365 U.S. 820, 81 S.Ct. 704, 5 L.Ed.2d 698.

Accordingly, the judgment of the district court is

Affirmed.

---

23. Because we reach this conclusion, it is unnecessary for us to decide whether permissive counterclaims presented as setoffs are required to have independent jurisdictional bases. *See* 6 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 1422, at 119 & n. 26 (1971); *but see id.* at 122 & n. 31. Here I.D.I. and Hidell are diverse, but, since only $3,400 is claimed as a setoff, the requisite jurisdictional amount does not exist. I.D.I. and Frieh are nondiverse. Neither counterclaim would present a federal question.